**UNITED STATES ex rel. Salvatore ANNUNZIATO**

v.

**John R. MANSON, Commissioner.**

**Civ. No. H–75–387.**

United States District Court, D. Connecticut.

Jan. 20, 1977.

As Corrected Feb. 23, 1977.

allegation of the complaint. (Everett Affidavit ¶¶ 5, 10 and Exhibits F and G).

Howard A. Jacobs, Jean L. Welty, Jacobs, Jacobs & Grudberg, New Haven, Conn., for plaintiff.

Ernest J. Diette, Jr., Asst. State's Atty., New Haven, Conn., for defendant.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

■ The petitioner, Salvatore "Midge" Annunziato, is currently serving a sentence of nine to fourteen years in the Connecticut Correctional Center at Litchfield as a result of his 1971 conviction in New Haven County Superior Court for conspiracy to commit murder. Petitioner brings this writ for habeas corpus contending both that the failure of the state to disclose exculpatory evidence relative to the interest of a key witness and the denial by the trial court to allow cross-examination as to pending criminal charges against two prosecution witnesses deprived him of his right to a fair trial as guaranteed by the fifth, sixth and fourteenth amendments to the Constitution.[1] *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

Petitioner's original appeal to the Connecticut Supreme Court was denied on September 16, 1975. *State v. Annunziato*, 169 Conn. 517, 363 A.2d 1011 (1975). Following an order of this court concerning a failure to exhaust state remedies regarding his *Brady* claim, petitioner applied for a writ of habeas corpus in Litchfield County Superior Court. That writ was dismissed in an unreported opinion on July 7, 1976. *Annunziato v. Manson*, Docket No. 25,827 (Superior Ct. Litchfield Cnty.). A Petition for Certification for review to the Connecticut Supreme Court was denied on July 15, 1976. It is conceded by the state that petitioner's claims are now properly before this court. Neither party has requested an evidentiary hearing, both sides preferring to rest on the record made in the state courts. The petitioner makes the point, from several different quarters, that he was unconstitutionally prevented from impeaching the state's principal incriminating witness. These arguments will be separately considered.

### Facts

Petitioner was convicted of conspiracy to murder one Edward Gould on the night of August 10, 1968. From the evidence introduced at trial the jury could have found that petitioner was at a party at Chip's Lounge in Fair Haven that evening. Gould was drinking at the bar. He observed Annunziato consult in a whisper with Richard Biondi, an associate of Annunziato.[2] Biondi, who had arrived at the party with a woman named Regina Baker, told Bruce Pino, another guest, "Take Regina home because I have some business to do for Midgie [Salvatore Annunziato]."[3] When Gould left the restaurant, he was met by Biondi and Francesco Annunziato, petitioner's son. They asked Gould to give them a lift to Francesco's car. While Gould was driving he saw a gun in the rearview mirror. He was wounded as he jumped from the moving vehicle.

The next day, Bruce Pino overheard a conversation between petitioner and his son at Mike's Restaurant. According to Pino,

---

1. Petitioner also alleges that the failure of the trial court to grant a request to charge as to lack of motive was constitutional error. This claim is not supported by *Pointer v. United States*, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208 (1894), upon which petitioner relies. In the context of the entire charge and the evidence presented at trial, I find that the court's refusal to give the requested charge would not require

a new trial. *Schaefer v. Leone*, 443 F.2d 182 (2d Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 277, 30 L.Ed.2d 251 (1971).

2. Biondi, an alleged co-conspirator, died prior to petitioner's trial.

3. Trial Transcript at 687, *State v. Annunziato*, Petitioner's Exhibit A [hereinafter Tr.].

Salvatore Annunziato swore and said in an angry tone, "You can't do anything right." [4]

About two years later, in March 1970, the victim Edward Gould had a conversation with petitioner in which he asked "what the reason was that he wanted to kill me." Petitioner responded, "I want to kill you because you killed my brother-in-law." [5] Sonnie Gondak, Salvatore Annunziato's brother-in-law, had died in a hit-and-run accident in 1963. In addition, there was some testimony from which the jury could have inferred that petitioner and Gould belonged to rival and antagonistic groups of associates.

### The Right-to-Confrontation Claim

Petitioner argues he was denied his sixth and fourteenth amendment rights to confront the witnesses against him by the refusal of the trial court to allow him to interrogate two prosecution witnesses regarding charges pending against them in state court to demonstrate their bias, interest, or motive. Bruce Pino, a crucial prosecution witness, had been arrested for possession of narcotics and charged as a second offender in 1968.[6] In addition, Judith Papero, a rebuttal witness for the state, had been arrested for sale of narcotics prior to petitioner's trial. Although the Connecticut Supreme Court ruled that evidence as to these pending charges was admissible to show the witnesses' bias, see State v. Moynahan, 164 Conn. 560, 601–03, 325 A.2d 199 (1973), it held that the failure to permit such testimony was harmless in petitioner's

case. It is unclear whether the Connecticut Supreme Court applied a constitutional standard in rejecting petitioner's claim, or only one of evidentiary procedure.[7]

Clearly, not every evidentiary ruling during a state criminal trial rises to a constitutional dimension so as to require federal relief on habeas corpus. Robinson v. Chesney, 403 F.Supp. 306, 309 (D.Conn. 1975), aff'd, 538 F.2d 308 (2d Cir.), cert. denied, —— U.S. ——, 97 S.Ct. 177, 50 L.Ed.2d 147 (U.S.1976). However, the right to cross-examine a witness to impeach his credibility or show motive or prejudice is fundamental to a fair trial. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). A defendant has a constitutional right to cross-examine a witness to show a bias arising out of a government offer of leniency or immunity. Alford v. United States, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931); [8] Flemmi v. Gunter, 410 F.Supp. 1361, 1371 (D.Mass.1976). Such evidence, which demonstrates a special motive to lie, is peculiarly probative "for if believed it colors every bit of testimony given by the witness whose motives are bared." United States v. Blackwood, 456 F.2d 526, 530 (2d Cir. 1972); United States v. Harvey, 547 F.2d 720 at 722–724, Docket No. 76–1183 (2d Cir. 1976). See also United States v. Rosner, 516 F.2d 269, 273 n.2 (2d Cir. 1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). As Chief Justice Burger reiterated in Davis, 415 U.S. at 318, 94 S.Ct. at 1111 the denial of the "right of

---

4. Tr. 696.

5. Tr. 78.

6. In fact, petitioner later discovered that Pino had made an extensive agreement with the federal and state authorities to obtain immunity on these charges and others in return for his testifying against Annunziato.

7. See Respondent's Memorandum of Law at 6–10; Petitioner's Motion to Reargue, State v. Annunziato, 169 Conn. 517, 363 A.2d 1011 (1975), Exhibit B to Petition for Writ of Habeas Corpus. In finding the trial court's rulings harmless, Judge Loiselle cited Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972), United States v. Reed, 437 F.2d 57 (2d Cir. 1971), Ray v. United States, 412 F.2d 1052

(9th Cir. 1969), State v. Tropiano, 158 Conn. 412, 262 A.2d 147 (1969), State v. Fredericks, 154 Conn. 68, 221 A.2d 585 (1966), DeCarufel v. Colonial Trust Co., 143 Conn. 18, 118 A.2d 798 (1955). Milton v. Wainwright and United States v. Reed were both holdings that error as to a constitutional right was harmless beyond a reasonable doubt. The other decisions appear to concern the prejudice of erroneous evidentiary rulings.

8. Chief Justice Burger in Davis v. Alaska, 415 U.S. at 318, 94 S.Ct. 1105 n.6, explained that although Alford dealt with a reversal because of abuse of discretion and prejudicial error, its holding was grounded in the Constitution.

effective cross-examination . . . ' "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314.' *Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968)."

■ The limits placed on the cross-examination of Bruce Pino were unjustified, *cf. United States v. Harvey, supra,* Docket No. 76–1183 (2d Cir. 1976), and not harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Pino was a key witness in the prosecution of petitioner. Only Pino's testimony directly connected petitioner to any of the events on the evening of August 10, 1968. Pino's observations plus Annunziato's statement to the victim two years after the shooting comprised the state's major evidence against the accused. The Connecticut Supreme Court pointed out that his "testimony tended toward proof of the crime charged." *State v. Annunziato*, 169 Conn. at 525, 363 A.2d at 1017. On habeas, Judge Martin conceded that this testimony "if believed by the jury, was damaging to the petitioner and without . . . [it] a conviction might not have been obtained." *Annunziato v. Manson, supra* at 1–2. The Connecticut Supreme Court noted, however, that Pino's prior convictions [9] and extensive drug use were before the jury and that defense counsel was able to cross-examine Pino as to the leniency he had received on federal bank robbery charges. The court concluded that:

> "The added evidence that Pino had pleaded not guilty to narcotics charges would have been purely cumulative and of no real significance in view of the evidence showing the facts and circumstances surrounding Pino's decision to

testify and the interest he had in testifying against the defendant, as well as the argument of defense counsel of such circumstances and the court's charge." 169 Conn. 517 at 526, 363 A.2d at 1017.[10] The difficulty with that view is that it does not withstand analysis. There is no need here to speculate in order to demonstrate the existence of prejudice. *Brookhart v. Janis, supra.*

First, while Pino's record of prior convictions and drug use may have borne on his general credibility, these bad acts did not show a continuing ulterior motive or bias for testifying. *Davis v. Alaska* allows a defendant specially to impeach a witness by revealing "possible biases, prejudices, or ulterior motives . . . as they may relate directly to issues or personalities in the case at hand." 415 U.S. at 316, 94 S.Ct. at 1110. *See also United States v. Garrett*, 542 F.2d 23, 27 (6th Cir. 1976). The bank robbery plea negotiations at best indicated Pino's motive for cooperating in January 1970. But that charge had been disposed of well before the trial of petitioner in February 1971. On the other hand, the narcotics arrests were formal charges still hanging over Pino's head when he testified. Evidence as to such new and different pending charges against Pino was not really "cumulative." There is a sharp difference between leniency already afforded for convictions in the past and promises of more leniency in the future for additional offenses on which he was still open to conviction. If petitioner had been allowed to inquire with respect to these arrests, he could have demonstrated Pino's present expectation of police and prosecutorial aid and protection in return for his testimony. Petitioner might also have elicited the fact that Pino had made a deal with the prosecution regarding these charges. This is not a

---

9. Defense counsel elicited the fact that Pino had been convicted of (1) possession of burglary tools; (2) four counts of statutory burglary; (3) conspiracy to commit bank robbery; and (4) possession and passing of counterfeit money. Counsel also brought out that Pino admitted to the police committing arson, but had not been prosecuted for that offense. Unknown to

counsel, Pino had confessed to the firebombing under a promise of immunity.

10. It should be borne in mind, however, that the full disclosures of Pino's agreement with the government made at the later habeas hearing were not before the Connecticut Supreme Court on direct appeal.

case of a trial judge exercising his informed discretion in limiting cross-examination where the jury is already in possession of sufficient information concerning the witness' motives for testifying. *Cf. United States v. Turcotte,* 515 F.2d 145, 151 (2d Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975). Here, the jury was left without any direct evidence as to what power the state could still exert over Pino's freedom. Just as in *Davis v. Alaska,* counsel was prevented from making a record as to why an individual "might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." 415 U.S. at 318, 94 S.Ct. at 1111.

■ The denial of the sixth amendment right requires a new trial without any special showing of prejudice. *Davis v. Alaska.* Furthermore, in this case Annunziato was clearly harmed by the trial court's rulings. Pino was a major witness in this case. His credibility was of critical importance. By excluding evidence as to the pending charges, the trial court deprived petitioner of the opportunity to show Pino's bias and interest and so raise a reasonable doubt as to his own guilt.[11] *United States v. Harvey, supra.*

### The Brady Claim

The harmful effect of the denial of the right to cross-examination protected by the sixth amendment, *Brookhart v. Janis, supra,* was further exacerbated by the prosecution's failure to disclose that the witness, Pino, had actually been promised leniency and other extensive police aid in return for his testimony.

Prior to trial, petitioner filed two discovery motions—one seeking "exculpatory information or material;" the other requesting "any information . . . either in writing or retained in the memory of any [of the state's] agents, concerning facts or factors which may in any way be favorable to the accused." These motions were granted as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The state represented that it had no exculpatory material in its possession.

In 1972, after the petitioner had been convicted and sentenced, Bruce Pino was again a witness for the prosecution in *State v. Porto,* Docket No. 16974 (Superior Ct. New Haven Cnty. 1972). As a result of Pino's testimony in that trial, counsel for the petitioner discovered that back in 1970 Bruce Pino had made a deal with the state and federal governments that, in return for his giving evidence at petitioner's trial and others, the pending state felony charges against him would be dropped, he would receive leniency on a bank robbery charge and immunity from prosecution for crimes to which he confessed while supplying information to the government. Pino admitted complicity in a shooting, a conspiracy to commit murder, a bank burglary, and a firebombing.[12] In addition, he was given police protection and promised, "they would move me and my family anywhere in the United States, change my name, get me a job, as long as I told the truth and everything."[13] This agreement was reached with Arnold Markle, the State's Attorney for New Haven County, and representatives of the F.B.I. and the United States Attorney's Office. The state has not challenged the accuracy of Pino's account of the deal.[14] Petitioner, relying on *Brady v. Maryland* and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), argues that the suppression of this information by the state requires a new trial.[15]

---

11. As recognized by the Connecticut Supreme Court, state law requires that petitioner be afforded the opportunity to cross-examine Mrs. Papero as to her pending criminal charges if there is a retrial.

12. Trial Transcript, *State v. Porto, supra* at 224, Petitioner's Exhibit B.

13. *Id.* at 118.

14. *See* Transcript, *Annunziato v. Manson, supra* at 5, Appendix to Petitioner's Amended Petition.

15. Judge Martin rejected the claim on habeas on the ground that this impeachment evidence would have been merely cumulative in light of Pino's prior convictions and the fact that the lenient sentence he received on the bank robbery offense was before the jury.

## A.

■ In *Giglio v. United States*, the Supreme Court found a denial of due process where the government's case included false testimony concerning a promise of leniency to an important witness and the prosecution knew, or should have known, of the perjury. The failure to disclose such promises requires a new trial if " 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.' " *Giglio v. United States*, 405 U.S. at 154, 92 S.Ct. at 766, *citing, Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).[16] Petitioner maintains that the state's repeated and successful objections to any mention of the pending narcotics charges against Pino prevented the defense from revealing the existence of the deal, misled the jury concerning the witness' bias and interest, and so constituted false evidence of which the prosecutor knew or should have known. *See Boone v. Paderick*, 541 F.2d 447, 450 (4th Cir. 1976), *application for cert. pending*, 45 U.S.L.W. 3432 (U.S. Dec. 8, 1976).

The state's objections were grounded on the proposition that an arrest without conviction was not probative of the witness' credibility and that cross-examination as to any pending charge would have prejudiced the witness' presumption of innocence. *But see, State v. Moynahan*, 164 Conn. 560, 601–03, 325 A.2d 199 (1973). While the sustaining of the objection to inquiry about pending charges might not necessarily have prevented defense counsel from inquiring about other possible aspects of the deal, further cross-examination was not likely to be productive in view of testimony that left the impression that all of the government's promises had been revealed and fulfilled. But that was not the case, and the government not only knew it, but participated in covering up the true situation.[17]

On re-direct examination, Pino testified in response to questions by Assistant State's Attorney Gaffney:

"Q: Did anyone ask you to give a statement, 'Because we have to get Midge,' or words to that effect?

"A: No.

"Q: Did anyone ever make a promise for your testimony?

"A: No.

"Q: Has anyone ever made a deal to you or with you?

"A: No."[18]

This testimony, elicited by the prosecution, was false, even bordering on perjury. Clearly, the state should have known of the inaccuracy. On re-cross-examination, counsel for petitioner's co-defendant[19] was able to bring out that a New Haven policeman had offered to speak on Pino's behalf concerning the bank robbery and other crimes to which Pino had confessed while providing information. But this limited amount of police aid is a far cry from the elaborate agreement and promises actually made. According to his own testimony in *State v. Porto*, Pino in January of 1970 had become a professional witness for the state concerning underworld activities. He was placed in protective custody, promised a new identity for himself and his family, and assured that he would not go to jail for *any* of his

---

**16.** The Supreme Court reaffirmed the vitality of *Giglio v. United States* in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**17.** The state attempts to derive some consolation from the fact that Assistant State's Attorney Gaffney who prosecuted the case may not have had actual knowledge of Pino's agreement with Gaffney's superior, State's Attorney Markle. However, *Giglio* makes clear that it is irrelevant whether the particular attorney who tried the case was aware of the deal:

"[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government."
405 U.S. at 154, 92 S.Ct. at 766.

**18.** Tr. 873–74.

**19.** Petitioner and his son, Francesco Annunziato, were tried jointly for conspiracy to commit murder.

crimes. Mr. Markle, the State's Attorney for New Haven County who helped negotiate the agreement, did in fact *nolle* the pending possession of narcotics and second offender charges sometime after the conclusion of petitioner's trial. Pino's testimony concerning the extent and scope of his cooperation with the prosecution was, at the very least, extremely misleading.

■ The applicable constitutional law has been cogently stated by Chief Judge Kaufman in *United States ex rel. Washington v. Vincent*, 525 F.2d 262, 267 (2d Cir. 1975):

"The knowing use by a state prosecutor of perjured testimony ordinarily results in a deprivation of fundamental due process, violating the 14th Amendment and requiring a new trial. *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (per curiam); *Napue v. Illinois*, 360 U.S. 264, 269, 271–72, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Whether the State solicits the false testimony or merely allows it to stand uncorrected when it appears does not diminish the viability of this principle, *Napue, supra*, 360 U.S. at 269, 79 S.Ct. 1173; *Giglio, supra*, 405 U.S. at 153, 92 S.Ct. 763; nor does the rule lose force because the perjury reflects only upon the credibility of the witness. *Napue, supra*, 360 U.S. at 269, 79 S.Ct. 1173. A conviction obtained through the use of testimony known by the State to be untrue must fall if

the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . [or if] the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial.

*Napue, supra*, at 271, 272, 79 S.Ct. at 1178; *Giglio, supra*, 405 U.S. at 154, 92 S.Ct. at 766."

■ Based on my review of the transcript, it is clear to me that the state's misbehavior in this case could have affected the outcome of the trial. Pino was the state's chief witness against Annunziato.

His testimony was all that directly tied petitioner to the shooting on August 10, 1968. Annunziato's statement to the victim, almost two years after the fact, demonstrates animosity but does not by itself link Salvatore Annunziato to the 1968 murder attempt.

Pino's credibility was subjected to considerable scrutiny. Both sides elicited the fact that he had received leniency in the form of a suspended sentence on a bank robbery conspiracy offense in return for his testimony at petitioner's trial among others. In addition, the trial judge specially charged the jury concerning a possible interest or bias on Pino's part. But testimony of the complete deal would not have been merely cumulative. To assure his testifying, the police had promised to afford Pino with protection and provide him with a new home and identity. His own safety and continued well-being then depended upon his cooperation with the authorities. The pending drug possession and second offender charges are also significant. They were crimes still hanging over Pino's head, unlike the bank robbery for which he had already been sentenced. In the face of Pino's denial as to the existence of any promise and the suppression by the prosecution of the full terms of the deal, defense counsel's argument challenging Pino's motive and interest was reduced to speculation and inference. As Judge Craven noted on similar facts in ordering a new trial,

"No matter how good defense counsel's argument may have been, it was apparent to the jury that it rested upon conjecture—a conjecture which the prosecutor disputed."

*Boone v. Paderick*, 541 F.2d 447 at 451. However, if the full scope of his deal had been disclosed, the witness' interest would have become fact, not mere speculation. Only then could the jury fully and fairly assess his credibility. I conclude therefore that if Pino's arrangement with the government had been completely delineated and his inducements to testify fully explored, there is a reasonable likelihood that the jury's judgment would have been affected.

## B.

The petitioner also contends that even if the facts of this case do not present a prosecutorial failure to correct false testimony so as to invoke the sanctions of *Giglio v. United States*, the prosecution's suppression of the agreement still violated due process within the meaning of *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Agurs*, the Court held that where the prosecution fails to supply exculpatory evidence in response to a general request for *Brady* material,[20] a new trial is required if the omitted evidence would raise a reasonable doubt as to the defendant's guilt in the context of the entire record.[21] There is no slide rule method for determining this. The standard is difficult to apply because it requires the reviewing court to subjectively weigh the evidence and assess its possible effect on the jury.[22] *See Moynahan v. Manson*, 419 F.Supp. 1139, 1149 (D.Conn.1976).

 I note at the outset that the same standard applies whether the nondisclosed evidence goes to the fact of the crime or tends to impeach a critical witness. *United States v. Stassi*, 544 F.2d 579 (2d Cir. 1976), *application for cert. pending*, 45 U.S.L.W. 3450 (U.S. Dec. 22, 1976). Although the Supreme Court considered only exculpatory evidence in *Agurs*, the Court's reasoning seems equally applicable to impeachment information withheld by the prosecution. Impeachment evidence may often be as significant as exculpatory evidence in determining the outcome of the trial. *See Garrison v. Maggio*, 540 F.2d 1271 (5th Cir. 1976) (Wisdom, J., dissenting). As Chief Justice Warren pointed out in *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959):

"The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."

*See also Giglio v. United States*, 405 U.S. at 153–54, 92 S.Ct. 763.

Although the jury did know of Pino's past inducements to cooperate with the police, they were kept in ignorance of his continuing motive and interest to testify for the state at the prosecution of Salvatore Annunziato in February of 1971. Pino had been sentenced on the conspiracy to commit bank robbery offense well in advance of petitioner's trial. The promise of leniency on the bank robbery charge provided an incentive for Pino to enter into a deal with the authorities in January 1970. Because the state suppressed the full terms of that arrangement, the jury could not have realized the extremely strong hold the state and federal governments had over Pino when he testified against Annunziato. His own safety was dependent upon the continued support of the police authorities. He might have to rely on the government to move him to a different part of the country and supply him with a new identity. His criminal exposure for the drug possession charges and other admitted crimes was substantial. State's Attorney Markle did not *nolle* those drug charges until after Pino appeared as a witness in the Annunziato trial. As a result of this discretionary prosecutorial act, Pino was able to avoid even being subjected to the sentencing discretion of a neutral judicial officer regarding those crimes. The nondisclosed evidence thus detailed powerful inducements for Pino to testify in a manner helpful to the government. This evidence would have provided the factual basis missing at trial for defense counsel to challenge Pino's interest and motivation for testifying. Based upon the knowledge gained from a review of the entire record, it is my opinion that, if the

---

**20.** That is the situation in the instant case.

**21.** Therefore, under the *Agurs* standard, the defendant must demonstrate much greater prejudice than is required in the *Giglio* situation.

**22.** This review is made all the more problematic when, as here, the closing arguments of counsel have been omitted from the trial transcript.

full terms of the agreement had been presented accurately to the jury, that evidence would have created a reasonable doubt as to petitioner's guilt. *Agurs v. United States,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342; *cf. Brach v. United States,* 542 F.2d 4 (2d Cir. 1976).

### Conclusion

The trial court's refusal to permit cross-examination of a major prosecution witness as to criminal charges pending against him to show motive and bias violated petitioner's sixth and fourteenth amendment rights of confrontation. The basis for this determination is strengthened by the prosecution's nondisclosure of impeachment information concerning an extensive offer of immunity and aid to a crucial witness. This prosecutorial misbehavior resulted also in a denial of due process. Such evidence would have created a reasonable doubt as to petitioner's guilt in the mind of the jury. And furthermore, even if the omitted evidence does not meet the strict materiality standard of *Agurs v. United States*, it surely would have affected the judgment of the jury and so a new trial is mandated by *Giglio v. United States.*

For these reasons, it is ORDERED that a writ of habeas corpus shall issue unless the state shall accord the petitioner a new trial within 60 days of the entry of judgment in this action.[23]

SO ORDERED.

---

23. These 60 days shall be computed in accordance with the rules stated in 18 U.S.C. § 3161(e), (h).