Charles Ervin WILLIAMS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Supreme Court of Kentucky.

June 13, 1978.

Richard Louis Receveur, Asst. Public Defender, Louisville, for appellant.

Robert F. Stephens, Atty. Gen., Victor Fox, Asst. Atty. Gen., Frankfort, for appellee.

CLAYTON, Justice.

On April 5, 1977, Charles Ervin Williams was convicted for the armed robbery of a Louisville restaurant and the murder of one of its patrons, receiving the maximum life sentence for each crime.[1] He now appeals, presenting four questions for our consideration. Of these, the only one which requires extensive discussion is whether the Commonwealth's Attorney's failure to provide the defense with information supportive of its claim that the prosecution obtained vacation of a conviction against its key witness in exchange for his testimony, deprived Charles of a fair trial. We believe that it did.

I

During the early morning hours of December 20, 1974, around 12:45, a dark-skinned man wearing a brightly colored ski

---

1. Although both the provisions under which Charles was indicted, 1966 Ky. Acts, Ch. 48, § 1 (KRS 433.140) and Ky.Stats. § 1149 (KRS 435.-010), originally permitted imposition of the death penalty, those sections of the statutes authorizing such punishment were subsequently declared unconstitutional. *See, e. g., Caine v. Commonwealth*, Ky., 491 S.W.2d 824, *cert. denied* 414 U.S. 876, 94 S.Ct. 80, 38 L.Ed.2d 121 (1973). Just twelve days after the commission of the offenses herein, both statutes were repealed. *See* 1974 Ky. Acts, Ch. 406, § 336 at p. 889; for current versions, *see* KRS 515.020 and KRS 507.020.

mask and brandishing a 9mm automatic pistol entered Cooksey's Grill in Louisville and commanded the manager and seven customers therein to lie face down on the floor. As Mike Morris rose from his chair to do so, the masked man shot him through the heart, killing him instantly. He then ordered Wanda Puckett, the manager, to open the cash register; after removing most of the money inside, he searched the pockets of both Morris and his tablemate, Barry Dorsey, and fled out the door. Two piles of loose change were later discovered in an alley behind Cooksey's, one pile only 50 feet from the restaurant, the other behind a house at 1840 West Hill Street, just a few blocks from Charles' residence at 2127 West Hill. The gun used in the robbery and murder was never found.

Because of the disguise which he had worn, none of the eyewitnesses were able to give a detailed description of the assailant when interviewed following the incident. All agreed that he was a brown-skinned male and that he was attired in a dark jacket and trousers. Delores Carter, who had obtained perhaps the best view of the masked man,[2] said she was positive that he had blue eyes and estimated him to be 5 feet 5 inches in height. Other witnesses reported that he had gray or green eyes and guessed him to be from 5 feet 8 inches to 6 feet 2 inches tall. Charles has brown eyes and is exactly 6 feet in height.

Although he too had been unable on the morning of the 20th to identify the assailant, it later dawned on Barry Dorsey that the individual who had committed the crimes at Cooksey's was one and the same person as a black male who had purchased cigarettes the evening of the 19th at the nearby gas station where Dorsey was employed. Approximately one week after this revelation struck him, Dorsey identified Charles from a group of police photographs as being that man. On December 29 Charles was asked, and he consented, to participate in a lineup before all of the

witnesses to the robbery and murder. After viewing Charles and five other black males, first with and then without ski masks on, none of the other eyewitnesses recognized the assailant among the men. Dorsey again identified Charles; as a result, Charles was arrested later that afternoon.

While Dorsey's identification of Charles was certainly important to the Commonwealth's case, the key prosecution witness at trial, and the one around whose testimony the controversy in this case centers, was Myer Pettyjohn. Charles was originally tried on September 28, 1976. At that trial, Pettyjohn initially testified that he knew absolutely nothing about the incident at Cooksey's and that he had never seen Charles before in his life. After a brief recess during which time Pettyjohn conferred with an official from the state Department of Corrections, however, Pettyjohn recanted his previous statements and gave testimony incriminating Charles as the perpetrator of the robbery and murder at Cooksey's.

According to this new testimony, on the morning of December 20, 1974, Pettyjohn had, despite the fact that he was on parole from a robbery conviction and was not supposed to be in Jefferson County, driven to Cooksey's in search of his friend Mike Morris. While sitting in his car across from the restaurant, Pettyjohn heard a gunshot, then saw a black male run out of the building with a gun in one hand and a ski mask in the other. Although he had no idea at that time who the man was, on January 28, 1975, Pettyjohn was placed in the Jefferson County jail after violating the conditions of his parole—he had been arrested in connection with yet another robbery—where he not only recognized Charles as the man he had seen at Cooksey's, but was actually told by Charles that he had committed the crimes. When asked on cross-examination why he had changed his testimony after the

---

2. In the confusion of the moment, Miss Carter had apparently stood up rather than lying down as ordered. This prompted the assailant, after he had shot Morris, to move to within one foot of Miss Carter, where he stared directly at her for several seconds and then told her she had better lie down on the floor or he would shoot her too.

recess, Pettyjohn responded that he had been afraid to testify against Charles until promised by the Corrections official that the two would be placed in different prisons if Charles should be convicted. Charles presented an alibi defense which was corroborated by several members of his family. Apparently unsure of whom or what to believe, the jury was unable to reach a verdict.

Charles was retried on April 5, 1977. Following a reiteration by Pettyjohn on direct examination of his "post-recess" testimony from the former trial, a *Cotton* hearing[3] was held to determine whether Pettyjohn had ever been convicted of any felonies which might reflect adversely on his credibility as a witness. There, Pettyjohn admitted that he had been convicted of robbery on three occasions, but stated that the most recent conviction had been vacated after Charles' first trial and that the charge was again pending.[4] Upon learning this, defense counsel asked the trial court if he could question Pettyjohn about the vacation and the circumstances surrounding it when they returned to the courtroom; reasoning that a conviction which has been vacated is no longer admissible for *Cotton* purposes, the trial court ruled that he could not. When the trial resumed, defense counsel did his best on cross-examination to discredit Pettyjohn's testimony, pointing out the two earlier robbery convictions, exposing his "pre-recess" testimony from the prior trial, and, without mentioning the vacation, implying the existence of a deal with the prosecution:

Q. And you know about people trying to make deals, don't you?

A. What kind of deals are you talking about?

Q. I'm talking about giving testimony against somebody for a little slack on these charges that you may have against you.

A. No, I don't know—

Q. You haven't heard anything about that?

A. What are you talking about, on TV, real life, or what?

Q. Real life.

A. I guess it happens.

Q. You came in that door didn't you? You're on the outside now.

On redirect examination by the Commonwealth's Attorney, however, Pettyjohn categorically denied having ever received any promises of leniency in exchange for his testimony.

Some five weeks after Charles' conviction, defense counsel filed a motion for new trial alleging (1) that he had since trial discovered evidence supportive of the defense's contention that Pettyjohn had been promised favorable treatment in exchange for his testimony against Charles and therefore possessed a motive to lie; and (2) that the Commonwealth's Attorney had failed to disclose this evidence as required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. At a hearing on the motion, it was revealed that while incarcerated following his arrest in January of 1975 for robbery, Pettyjohn had written several letters to his fiancee in which he referred to using his knowledge of the incident at Cooksey's and other crimes as a "trick" for obtaining release from prison, and stated he would only divulge this information to the authorities if they would "help get the hold off." When questioned about these remarks, Pettyjohn admitted he had hoped to gain his freedom by testifying against Charles, but again denied that any promises had actually been made or that his testimony had been fabricated. It was further revealed that when Pettyjohn's robbery conviction was in fact vacated after Charles' first trial, the order authorizing

---

3. See *Cotton v. Commonwealth*, Ky., 454 S.W.2d 698 (1970).

4. Pettyjohn was convicted and sentenced to 9 years' imprisonment following the entry of a guilty plea on September 29, 1975, nearly four months after he had disclosed his information to the authorities. On January 31, 1977, he filed a motion pursuant to RCr 11.42 to set aside the guilty plea on the ground that he had been emotionally upset at the time the plea was entered. On February 21, 1977, the motion was granted.

the vacation had been sent to the prosecutor in Charles' case, Commonwealth's Attorney Zollinger, for his approval, despite the fact that he was in no way involved in the prosecution of Pettyjohn. Zollinger admitted during the hearing he had recommended that the conviction be vacated, but like Pettyjohn denied the existence of a deal. On June 24, 1977, the motion for new trial was denied. This appeal followed.

## II

■ In determining whether the court below acted properly in denying Charles' motion for new trial, *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) requires that we distinguish between two types of cases, each involving the discovery after trial of exculpatory evidence known to the prosecution but unknown to, and for that reason not specifically requested by,[5] the defense: those which might be called "perjury" cases, and those which might be called "discovery" cases. *See United States v. Sutton*, 542 F.2d 1239 (4th Cir. 1976).

The hallmark of a "perjury" case, perhaps the most obvious example of which is *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1975), is an allegation by the defense that the undisclosed evidence reveals the presence of perjured testimony in the government's case. In *Giglio*, the key prosecution witness, himself a potential indictee, testified at trial that he had received no promises of non-prosecution in exchange for his testimony implicating the defendant; after trial, the government admitted that such a promise had been made. Noting that the testimony of that witness was so vital to the success of the government's case that the issue of his reliability may well have been determinative of the defendant's guilt or innocence, the court awarded the defendant a new trial.

A "discovery" case, on the other hand, involves the suppression of evidence which is favorable in some other way to the defense: it is characterized not by a conviction based on false evidence, but rather by a conviction based merely on less than all the available exculpatory evidence. This evidence can be either directly exculpatory, as in *Agurs* itself, where the government withheld evidence supportive of the defendant's claim of self-defense, or indirectly exculpatory, again in the sense that it impeaches the credibility of a witness whose testimony may be determinative of guilt or innocence. *See Garrison v. Maggio*, 540 F.2d 1271 (5th Cir. 1976) (Wisdom, J., dissenting); *United States ex rel. Annunziato v. Manson*, 425 F.Supp. 1272 (D.Conn. 1977). A case of the second type would, we suppose, have been created if defense counsel in *Giglio* had not elicited a denial from the witness that a promise had been made; for even in the absence of perjured testimony, evidence of a promise would still have been valuable to the accused to show that the witness possessed a motive to fabricate.[6]

■ Because the harm to the defendant resulting from nondisclosure in a "perjury" case is potentially twofold—not only does he not enjoy the advantage of being able to impugn the witness' credibility, he actually suffers the disadvantage that the witness' credibility is enhanced by the perjured testimony—in order to have his conviction set aside the defendant in such a case need only show that "the false testimony could in any reasonable likelihood have affected the judgment of the jury." *See Giglio*, 405 U.S. at 154, 92 S.Ct. at 766, quoting from *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The defendant in a "discovery" case, however, who is harmed only in the former manner, must demonstrate that the newly discovered evidence, if it had been known to

---

5. Where a specific request is made for information prior to trial, as in *Brady*, so long as there is a "substantial basis" for claiming materiality exists, "the failure to make any response is seldom, if ever, excusable." *Agurs*, 427 U.S. at 106, 96 S.Ct. at 2399.

6. *But see* Mr. Justice Marshall's dissenting opinion in *Agurs* to the effect that the result in *Giglio*, and the standard for awarding a new trial which was utilized therein, would have been no different if perjury had not been involved. *Id.*, 427 U.S. at 121, 96 S.Ct. 2392.

the jury, would have created a reasonable doubt as to guilt which would not otherwise have existed without the evidence. *Agurs*, 427 U.S. at 112, 96 S.Ct. 2392. This standard is both difficult for the defendant to meet, since it requires a greater showing of prejudice than does the "perjury" standard, and difficult for a reviewing court to apply, in that it requires a subjective appraisal of the evidence and its possible effect on the jury.

Obviously the threshold question in the instant situation is whether the undisclosed information, when considered in conjunction with other evidence in the case, adequately supports Charles' allegation that the Commonwealth's case contains perjured testimony so as to fit the case at hand into the "perjury" category. We believe that it does. For although the evidence of a deal in the present case is not as unequivocal as that in *Giglio*, so long as the evidence "even arguably give[s] rise to an inference of perjury," *Agurs*, 427 U.S. at 114, 96 S.Ct. at 2402, it is sufficient to create a jury question on the matter, and the failure to disclose the information constitutes error. *See Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); *cf. Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). In the case at bar, the evidence supportive of Charles' allegation that Pettyjohn expected prosecutorial aid in exchange for his testimony does appear, at least superficially, to contain the basic ingredients of a deal. Prior to Charles' first trial, Pettyjohn stated in no uncertain terms that he would not testify against Charles unless guaranteed his release from prison. Pettyjohn then testified, and shortly thereafter was in fact released from jail. When embellished by the fact that Pettyjohn initially refused to incriminate Charles and did so only after conferring with a government official, and

that the order vacating his conviction was sent to the prosecutor in Charles' case for approval, despite his lack of connection with Pettyjohn's case,[7] we cannot discount altogether Charles' allegation that the undisclosed evidence as it might have been developed by skilled counsel at trial would indeed have convinced the jurors that there was a deal.

This does not end our inquiry, however, since even if we assume for purposes of argument that the jury would have believed a promise was made and that Pettyjohn's denial of such a promise was therefore false, it must still be determined whether there exists any reasonable likelihood that the false testimony could have affected the judgment of the jury under the evidence as a whole. Resolution of this question depends on at least two factors, including (1) the extent to which Pettyjohn was otherwise impeached, and (2) the importance of Pettyjohn's testimony to the prosecution's case.

With respect to the first, we cannot say that any impeachment which might have resulted from disclosure of the suppressed information to the jury would have been merely cumulative. While it is true that defense counsel was able to cast some doubt on Pettyjohn's believability anyway by exposing the fact that he was a convicted felon and that he had perjured himself at Charles' prior trial, there is a vast difference between being able to show that a witness' credibility is generally bad and that he has lied in the past, and being able to show that he has a specific motive to lie in the case at hand. *See Davis* and *Annunziato*, both *supra*. Had defense counsel known of the undisclosed evidence and presented it to the jury in such a manner as to convince them that Pettyjohn did in fact possess a motive to fabricate, therefore, this impeachment evidence might well have been the telling blow in discrediting his credibility.

7. Although it might be argued that the order vacating Pettyjohn's conviction contained nothing which would indicate an expectation of favorable treatment—indeed, Commonwealth's Attorney Zollinger was careful to note on the document that he had "never talked to this man but he testified on behalf of the Commonwealth without promise or agreement"—the mere fact that the order was sent to Zollinger for his approval is somewhat suspicious in and of itself. *Cf. United States v. McCrane*, 547 F.2d 204 (3rd Cir. 1976).

Nor are we able to say that even if the jurors had heard the evidence, agreed there was a deal, and rejected Pettyjohn's testimony entirely, they would nevertheless have convicted Charles anyway. Of all the evidence presented by the Commonwealth, Pettyjohn's identification of Charles as the perpetrator of the robbery and murder at Cooksey's was by far the most damaging. Pettyjohn was the only witness who claimed to have seen the assailant without his mask on. He was also the witness who alleged that Charles had confessed to the crimes. Had the jurors rejected his testimony, it is highly possible, perhaps even probable, that they, like their fellow jurors from the former trial, would have been unable to base a conviction on the remaining prosecution evidence. Because there is a reasonable likelihood that Pettyjohn's testimony, and hence his reliability, may have been determinative of Charles' guilt at trial, the failure by the prosecution to disclose evidence affecting his reliability requires that Charles be given a new trial.

### III

It should be noted that the same result can be reached on the ground that Charles was denied the right "to be confronted with the witnesses against him" as guaranteed by the Sixth and Fourteenth Amendments. As mentioned previously, it was discovered during the *Cotton* hearing at Charles' second trial that the most recent of Pettyjohn's robbery convictions had been vacated and that charges were again pending against him. Upon learning this fact, defense counsel asked the court if he might cross-examine Pettyjohn about the vacation and the circumstances surrounding it. The trial court, however, obviously thinking only of whether testimony relating to a vacated conviction was admissible for purposes of *Cotton*, ruled that counsel could not mention that conviction or anything relating to it.[8]

It is well established in this day and time that the right to cross-examine a witness to impeach his credibility or show motive or prejudice is fundamental to a fair trial. *Davis, supra; Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Thus, a defendant has a right to expose the fact that a witness has criminal charges pending against him and thereby possesses a motive to lie in order to curry favorable treatment from the prosecution. *See Annunziato, supra.* In the instant case, Charles was denied that right because of the trial court's ruling that the vacated conviction and the charges stemming from it were not proper subjects of cross-examination. Just as in *Davis,* counsel was prevented from making a record as to why Pettyjohn "might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Davis,* 415 U.S. at 318, 94 S.Ct. at 1111. As a result, the jury was left to consider Pettyjohn's testimony without any nonspeculative evidence as to what power the state could still exert over his freedom. *Annunziato.* Whether in every instance such a denial would amount to a "constitutional error of the first magnitude" requiring a new trial without any special showing of prejudice, *cf. Davis,* 415 U.S. at 318, 94 S.Ct. at 1111; and *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968), we need not decide. Suffice it to say that under the totality of circumstances existing in this case the court's refusal to allow defense counsel to pursue the question of a possible

---

**8.** MR. RECEVEUR: . . . he had a PV and then he was arrested for robbery while he was on parole.

MR. ZOLLINGER: That was set aside, wasn't it?

A. Yes, sir.

MR. RECEVEUR: Is it pending?

A. Yeah.

COURT: Now wait a minute. You have been convicted previous to that of robbery also, which was not set aside, is that right?

A. Yes, sir.

COURT: So I think the limiting feature of the thing is quite applicable now and you should not ask him how many times or anything like that because after all, you've got a judgment set aside, I can't presume that he's . . .

MR. RECEVEUR: Can I inquire of him if he knows why it was set aside or what ground?

COURT: No, sir. . . .

"deal" through the process of a searching cross-examination was not consistent with our conception of fair trial, of which the right of confrontation and cross-examination is a vital part.

## IV

Charles' other three assignments of error require but brief comment:

■ First, we cannot say as a matter of law that Pettyjohn's testimony incriminating Charles was perjured merely because it contradicted the testimony given by him prior to the recess at the first trial. The fact of the matter is that just as in most cases involving the recantation, after trial, of testimony given during trial, we simply do not know and have no way of knowing which story is correct and which story is false.

■ Secondly, while it is clear, in light of the trial court's pretrial order that all prosecution witnesses be instructed not to mention it, that the testimony about Charles' having been seen smoking marijuana should not have occurred, we do not believe that it could have significantly affected the judgment of the jury.

■ Finally, we similarly do not believe that Charles was unduly prejudiced by anything which occurred during closing argument. Although the comments by the prosecutor implying that witnesses in the case had been threatened by members of Charles' family were improper, see Campbell v. Commonwealth, Ky., 564 S.W.2d 528 (decided February 21, 1978), they were not sufficient to deprive Charles of a fair trial.

The judgment is reversed and the case is remanded for a new trial.

PALMORE, C. J., and LUKOWSKY and REED, JJ., concur.

JONES, STEPHENSON and STERNBERG, JJ., dissent.

JONES, Justice, dissenting.

In my view, the opinion of the majority is based neither on the law nor the facts. It is bottomed on pure speculation and whimsey. There is not a shred of evidence to show that a "deal" was made. In fact the evidence is to the contrary. The majority of the members of this court quite candidly admit there is no evidence to support their view. The following statement in the opinion indicates as much:

"Had the jurors rejected his testimony, it is highly possible, perhaps even probable, that they, like their fellow jurors from the former trial, would have been unable to base a conviction on the remaining prosecution evidence. Because there is a reasonable likelihood that Pettyjohn's testimony, and hence his reliability, may have been determinative of Charles' guilt at trial, the failure by the prosecution to disclose evidence affecting his reliability requires that Charles be given a new trial."

The majority view is a radical departure from the law that has existed in this jurisdiction since the genesis of this Commonwealth. Other jurisdictions, as well as the United States Supreme Court, have not chased a will-o'-the-wisp to "discover" an error where none exists. The facts in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1975), cited by the majority as a "hallmark of a perjury case," is as different from the facts in this case as night is from day. In that case, the government admitted it had promised Giglio it would not prosecute him in exchange for testimony implicating the defendant. That is not the case here. Then, the majority like a "gallant knight . . . in search of Eldorado," [1] proceeds on the elusive theory of "discovery," and in my view, discovered nothing. Then the majority turns full circle back to "perjury," when there is no evidence of Pettyjohn's perjury—merely an assumption that he lied when he said there were no deals.

Williams committed the heinous crimes of armed robbery of a restaurant, and murder

1. Edgar Allen Poe, *Eldorado*.

of one of its patrons. In my view, he had a fair trial. The judgment ought to be affirmed.

STEPHENSON, Justice, dissenting.

My first objection to the majority opinion is that the case is reversed on the suspicion that Pettyjohn perjured himself when he denied a "deal" with the Commonwealth.

A further objection is that the majority opinion fashions a new evidentiary rule of law to find the trial court in error in denying to defense counsel the right to explore the circumstances of the judgment of conviction being vacated.

The majority opinion holds that a defendant has a right to expose the fact that a witness has criminal charges pending against him and thereby possesses a motive to lie in order to curry favorable treatment from the prosecution. This holding overrules, without saying so, a consistent line of cases in this Commonwealth that say pending criminal charges are not a proper subject of cross-examination for the purposes of impeachment. 19A Ky. Digest, Witnesses 345(1).

Discovery of this new right is based on *Annunziato,* an opinion of the United States District Court for the District of Connecticut. The holding in that opinion is apparently based on state law in Connecticut which recognizes the right to cross-examine a witness as to pending criminal charges. I object strongly to "discovering" this new "right" in this jurisdiction. Our present rule seems adequate and fair to me. Anyway, *Annunziato* turned primarily on *Giglio* grounds as stated in the opinion.

In my view, the trial court did not commit error during the *Cotton* hearing. The majority opinion recognized that the trial court was obviously thinking only of whether testimony relating to a vacated conviction was admissible for purposes of *Cotton.* Of course it was not; nor did defense counsel even pretend that he wished to cross-examine on the pending charge. The query, "Can I inquire of him if he knows why it was set aside or what grounds?" does not present such a question. It occurs to me that there was no objection to the ruling of the trial court, no attempt by defense counsel to explain that he wished to cross-examine Pettyjohn if a "deal" had been made, and no request to introduce the testimony into the record by avowal. It is apparent to me that defense counsel did not have a "deal" in mind at the time.

Defense counsel was not precluded from asking Pettyjohn if he had made a "deal" with the Commonwealth and did not do so. *Davis* and *Greene* can be distinguished on the factual situation. *Davis* involved a witness on probation and subject to being connected with the crime, and *Greene* involved allegations in an administrative hearing by individuals who did not testify or appear. I would disregard *Annunziato.* So much for the trial of the case.

Next, on motion for a new trial on the ground of discovery of evidence that Pettyjohn had been promised favorable treatment in exchange for his testimony against Charles and, therefore, possessed a motive to lie, I cannot see how the facts developed on the hearing can justify the majority in applying *Giglio,* a "perjury" case. There the prosecution admitted a deal; here Pettyjohn denied a deal. Commonwealth's Attorney Zollinger denied a deal, and Pettyjohn explained the basis for the RCr 11.42 motion which resulted in the judgment being vacated. He stated he was suffering from emotional disturbance at the time of his guilty plea and asked that it be withdrawn and he be permitted to plead not guilty.

I am baffled as to how any of the evidence at the hearing can justify fitting this case within the "perjury" rule. As to the "discovery" of exculpatory evidence cases, an *Agurs* situation, it appears to me that the evidence developed at the hearing was not exculpatory. The letters written by Pettyjohn to his fiancee, about using his knowledge of the incident at Cooksy's, buttress the truthfulness of Pettyjohn's testimony and demonstrate that he did not fabricate his testimony as the result of a deal. If all this evidence were presented to a

jury, as I presume the majority opinion intends, I believe it would strengthen the case of the Commonwealth. In my view, if any case applies it is *Agurs,* and application of the *Agurs* rule would affirm the case. It occurs to me that on the hearing defense counsel had every opportunity to call other witnesses from the Commonwealth's attorney's office to clarify the situation. He chose to leave the question to speculation on the assertion of a "deal," and I would not speculate in his favor. Even applying the *Giglio* rule, I would say that there is no reasonable likelihood that all of the "discovered evidence" could have affected the judgment of the jury under the evidence as a whole. The conclusion in the majority opinion that the Commonwealth failed to disclose a "deal" is unwarranted.

I respectfully dissent and would affirm the case.

STERNBERG, Justice, dissenting.

On this appeal four questions are argued. First, it is contended that the Commonwealth made a deal with the witness Myer Pettyjohn to set aside his recent felony conviction in exchange for his testimony identifying the appellant as the person who committed the armed robbery with which appellant was charged. The Commonwealth's Attorney denied making such a deal, and Pettyjohn denied that such a deal existed. The relationship of the Commonwealth's Attorney with Pettyjohn can best be demonstrated by the following questions asked the witness by the Commonwealth's Attorney in the in-chambers *Cotton*-type hearing (*Cotton v. Commonwealth,* Ky., 454 S.W.2d 698 (1970)):

"By Mr. Zollinger:

Q. Mr. Pettyjohn, prior to your testimony did you ever talk to me?

A. No, sir.

Q. Has anybody promised you anything in return for your testimony?

A. No, sir.

Q. This Mr. Meany that you talked to, did he make any promises to you?

A. The only thing that Mr. Meany assured me of was my safety. If Mr. Williams should go to the penitentiary that I would be in one penitentiary and that he would be in another one.

Q. And that was what made you testify?

A. Yes, sir.

Mr. Zollinger: That's all."

The evidence offered by the appellant that such a deal did exist is purely speculative and conjectural. It does not attain such status as to compel a conclusion that such a deal did exist. It deserves no more than this passing comment.

There is one matter, however, that is cause for concern. In the *Cotton*-type hearing the learned trial judge heard testimony and arguments relative to Pettyjohn's parole revocation and arrest. The following dialogue took place:

"Mr. Receveur:

He was on parole—as you testified, you were on parole when you claimed to have seen Charles Williams and then you were arrested for the robbery.

Court:

Was it a parole revocation or something?

Mr. Zollinger:

Yes. Your parole was revoked, wasn't it?

Court:

Well, that was the same conviction you've already ask about. You can't hardly ask him about it twice, can you?

Mr. Receveur:

No, he had a PV and then he was arrested for robbery while he was on parole.

Mr. Zollinger:

That was set aside wasn't it?

A. Yes, sir.

Mr. Receveur:

Is it pending?

A. Yeah, Um-hum.

Court:

Now wait a minute. You have been convicted previous to that of robbery also, which was not set aside, is that right?

A. Yes, sir.

Court:

So I think the limiting feature of this thing is quite applicable now and you should not ask him how many times or anything like that because after all you've got a judgment set aside, I can't presume that he's . . .

Mr. Receveur:

Can I inquire of him if he knows why it was set aside or what grounds?

Court:

No, sir. You can certainly ask him if he's been convicted of a felony and if that felony was robbery. I think that's all, in fairness, and I'll have to admonish the jury."

During the course of the second trial counsel for appellant, in his cross-examination of Pettyjohn, asked the following questions, to which the following answers were given:

"Court:

Well let's find out who may have spoken to him, if anybody, about it.

Q. Did anybody talk to you about your testimony?

A. No.

Q. You're saying that your testimony at the Charles Williams murder trial didn't have anything to do with setting aside that robbery conviction; is that right?

A. That's what I'm saying to you.

Q. Nothing to do with it at all?

A. Right.

Q. You're absolutely certain about that?

A. Right.

Q. Did you have a conversation with your attorney about Mr. Zollinger not opposing it—your sentence being set aside?

A. Did I have a conversation with who?

Q. With your attorney concerning Mr. Zollinger not opposing setting aside your plea of guilty?

A. I never have talked to him about it?

Q. Never?

A. No.

Q. Never?

A. Not Mr. Zollinger."

Appellant argues that the effect of the ruling of the trial judge was to deny him the right to interrogate Pettyjohn relative to the alleged deal. Consequently, appellant contends he was denied his right of cross-examination. Had that been the ultimate effect of the court's ruling, then, and in that event, the appellant's argument may have been tenable. In *Parsley v. Commonwealth*, Ky., 306 S.W.2d 284 (1957), we said:

"The interest of a witness, either friendly or unfriendly, in the prosecution or in a party is not collateral and may always be proved to enable the jury to estimate credibility. It may be proved by the witness' own testimony upon cross-examination or by independent evidence. * * * *"

Furthermore, in *Clark v. Commonwealth*, Ky., 386 S.W.2d 458 (1965), we held:

"Appellant proffered evidence, which is in the record by avowal testimony of the deputy circuit clerk, which showed that Sharp had been indicted in April, 1963, on twenty separate counts for stealing merchandise from Murphy-Miller; that in July, 1963, he had entered a guilty plea to six of the counts, and that in August of that year the other fourteen counts had been dismissed on motion of the Commonwealth. Under the circumstances of this case, we believe it was error to refuse this evidence. Although Sharp specifically denied that he had been promised leniency in exchange for his testimony, the circumstances of the dismissal of the fourteen counts, coupled with Sharp's appearance before the grand jury after the dismissal—and his appearance as the prime prosecuting witness after the dismissal—tend to support the inference that Sharp's testimony was the result of a biased personal interest."

In the first place the ruling of the trial judge pertained to interrogation relating to Pettyjohn's prior felony convictions and did not pertain to any deal. As a matter of fact, the trial judge, during the second trial

and while the witness Pettyjohn was under cross-examination by counsel for appellant and while considering the propriety of the testimony pertaining to a deal, made the following statement:

"Well, I understand what you're trying to get to. I would like for you to go ahead and get there. I don't know what this part of it you're asking now has to do it. If he was influenced by anything I think you may directly ask him that. If anything influenced his testimony and if he changed it then why and so forth, particularly; well I don't want to presume anything."

Secondly, and assuming for the sake of argument only that the trial judge did mean for the ruling to apply to interrogation relating to an alleged deal, there is no objection made to the court's ruling, thereby waiving any error. *Cavins v. Commonwealth,* Ky., 272 S.W.2d 656 (1954).

I concur with the majority opinion in the manner in which it disposes of the allegations of perjured testimony, the testimony relating to the smoking of marijuana, and the argument of the Commonwealth's Attorney.

I respectfully dissent. I would affirm.