Lewis Earl **DAVENPORT**, Appellant,

v.

**COMMONWEALTH of Kentucky,** Appellee.

No. 2002–SC–0483–MR.

Supreme Court of Kentucky.

Oct. 20, 2005.

Rehearing Denied Dec. 22, 2005.

---

Randall L. Wheeler, Assistant Public Advocate, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, John R. Tarter, Samuel J. Floyd, Jr., Michael Harned, Assistant Attorneys General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice JOHNSTONE.

Appellant, Lewis Earl Davenport, appeals from a judgment of the McCreary Circuit Court. Following a jury trial, Appellant was found guilty of murder and first-degree robbery. He was sentenced to fifty years' imprisonment for the murder conviction and received ten years' imprisonment for the robbery conviction, to be served concurrently. He now appeals as a matter of right, alleging five trial errors: (1) that the trial court erred when it refused to allow defense counsel to cross-examine a witness regarding his probationary status; (2) that defense counsel was improperly prohibited from cross-examining a witness regarding her financial affairs; (3) that the trial court erred in allowing a police detective to testify regarding his observations as to the demeanor of another witness; (4) that he was improperly denied a request for funds with which to hire an expert witness; and (5) that his motion for a directed verdict of acquittal was improperly denied. For the reasons set forth herein, we affirm.

## Background

Patrick Perkins was found dead in his home in McCreary County at about 9 p.m. on January 5, 2001. Emma Ross, a friend of Perkins, was the first to discover his body. Unable to revive him, she eventually summoned Perkins' sister, Phoebe Burke, and Burke's boyfriend, Cleo Wilson, to the house for assistance. Burke arrived and immediately called 911. In response, McCreary County Sheriff's Deputy Freddie Clark arrived at the scene. Kentucky State Police Trooper Craig Reed and Kentucky State Police Detective Colan Harrell were later summoned to the scene as well.

Perkins' home was in disarray, with blood on the wall and furniture overturned. Harrell also found three spent shell casings on the floor near the body. A fourth casing was underneath the body. A cane was found next to the body. The investigators noticed that Perkins' pants pockets were turned out and empty and that Perkins' .25 caliber pistol was missing, though two other pistols and $247 in cash remained in the home. A medical examiner determined that Perkins had received four shots to his chest, neck and head, and that his arms and wrists sustained defensive wounds.

When interviewed, Appellant admitted that he had been at Perkins' home on the evening of January 5. Appellant explained that he had gone to Tennessee to visit the Wooden Nickel Bar that evening, but had

left the bar around 7:30 p.m. and was taken to his nephew's home in Pine Knot, Kentucky. Eventually, Appellant asked his nephew, Chris Davenport, for a ride to Perkins' home for the purpose of buying whiskey. According to Appellant, he obtained the whiskey and left Perkins' home, walking several miles to Ruby Davis's house. Davis confirmed that Appellant visited her home on the evening of January 5, but stated that Appellant did not have a bottle of whiskey with him when he arrived.

Chris Davenport (hereinafter Davenport) testified that he drove his uncle to Perkins' home, arriving a little after 8 p.m. Shortly after his uncle entered the home, Davenport saw Appellant "bounce off the front door" and heard a male voice cry, "please, don't kill me." Davenport stated that the screaming voice was not that of his uncle. Scared, he left, leaving Appellant at Perkins' home. He went alone to the home of Charles Stephens. Davenport told Stephens that he believed a fight was occurring at Perkins' house and that someone might be hurt. Stephens called Perkins' home, but no one answered. Davenport then went home; Appellant arrived the following day at five o'clock in the evening. According to Davenport, Appellant instructed him to deny leaving his uncle at Perkins', and to say instead that he had dropped Appellant off at Ruby Davis' house.

A McCreary County Grand Jury returned a two count indictment against Appellant, charging him with murder and robbery. He was tried before a jury and found guilty on both counts. Appellant was sentenced to fifty years' imprisonment for murder, and ten years' imprisonment for robbery, to run concurrently. This appeal followed.

**Cross–Examination of Chris Davenport**

■ Appellant first challenges the trial court's refusal to permit defense counsel to cross-examine Chris Davenport about his probationary status and his pending misdemeanor charges. On avowal, Davenport testified that he was on probation from the Pulaski Circuit Court at the time of his cooperation with McCreary County police and at the time of his testimony. He also revealed that he was presently in jail awaiting trial in McCreary County on two misdemeanor charges at the time of his testimony.

Appellant argues that the proposed cross-examination was necessary to impeach Davenport's credibility, by establishing the possibility that Davenport may have cooperated with the McCreary County police in anticipation of leniency regarding his probation in Pulaski County. Moreover, defense counsel wished to establish that an even greater potential for bias existed where Davenport was facing two misdemeanor charges in McCreary County at the time of the trial. Appellant claims the exclusion of that testimony violates his Sixth Amendment right to cross-examine the prosecution's witnesses. The Commonwealth asserts that the trial court acted well within its discretion to limit the cross-examination of Davenport or, in the alternative, the prohibition was harmless.

■ An essential aspect of the Sixth Amendment Confrontation Clause is the right to cross-examine witnesses. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934, 937 (1965). Additionally, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347, 354 (1974). However, it is equally well established that the right to cross-examination

is not absolute and the trial court retains the discretion to set limitations on the scope and subject: "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986) (emphasis in original). Indeed, the trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." 475 U.S. at 679, 106 S.Ct. at 1435. In defining reasonable limitations on cross-examination, this Court has cautioned: "a connection must be established between the cross-examination proposed to be undertaken and the facts in evidence." *Commonwealth v. Maddox,* 955 S.W.2d 718, 721 (Ky.1997).

▆▆▆ Therefore, a limitation placed on the cross-examination of an adverse witness does not automatically require reversal: the "denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." *Van Arsdall,* 475 U.S. at 682, 106 S.Ct. at 1437. Rather, a reviewing court must first determine if the Confrontation Clause has been violated. The Court explained:

> While some constitutional claims by their nature require a showing of prejudice with respect to the trial as a whole, the focus of the Confrontation Clause is on individual witnesses. Accordingly, the focus of the prejudice inquiry in determining whether the confrontation right has been violated must be on the

particular witness, not on the outcome of the entire trial.... We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness." Respondent has met that burden here: A reasonable jury might have received a significantly different impression of [the witness'] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination.

475 U.S. at 680, 106 S.Ct. at 1435–36 (internal citations omitted).

The Supreme Court, in *Van Arsdall,* made clear that the trial court enjoys discretion to limit cross-examination of an adverse witness, even when the limitation is placed on evidence of bias: the Sixth Amendment "does not prevent[s] a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." 475 U.S. at 679, 106 S.Ct. at 1435. In delineating the boundaries of the trial court's discretion in limiting cross-examination, this Court has explained: "So long as a reasonably complete picture of the witness' veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Commonwealth v. Maddox,* 955 S.W.2d 718, 721 (Ky.1997), *citing United States v. Boylan,* 898 F.2d 230, 254 (1st Cir.1990). The Court of Appeals has likewise observed: "In weighing the testimony the jury should be in possession of all facts calculated to exert influence on a witness." *Spears v. Commonwealth,* 558 S.W.2d 641, 642 (Ky.App.1977).

Thus, reviewing courts have found reversible error when the facts clearly support an inference that the witness was biased, and when the potential for bias exceeds mere speculation. In *Van Arsdall,* the Confrontation Clause violation occurred when the trial court excluded evidence that a key prosecution witness's criminal charge had been dismissed after he agreed to talk with investigators about the murder, an agreement which the witness readily acknowledged. 475 U.S. at 676, 106 S.Ct. at 1432. In *Spears,* error occurred when the trial court excluded evidence that the principal prosecution witness had an indictment pending at the time of trial *in the same county. Id.* In *Williams v. Commonwealth,* this Court determined that the trial court should have permitted defense counsel to question a key witness about the possibility of a "deal" with the Commonwealth. 569 S.W.2d 139 (Ky.1978). In *Williams,* though, evidence supporting the Inference of bias was strong: the key witness refused to testify at the defendant's first trial unless he was released from jail, he was in fact thereafter released, the conviction was later vacated, and he admittedly refused to incriminate the defendant until after he had spoken with a government agent. *Cf. Nunn v. Commonwealth,* 896 S.W.2d 911 (Ky.1995) (finding no violation of appellant's confrontation rights where the trial court prohibited cross-examination of a key witness regarding pending charges against him, particularly in light of the extensive cross-examination that was permitted and the potential for juror confusion).

The trial court does not err in limiting evidence of potential bias when there is a lack of credible evidence supporting the inference. In *Bowling v. Commonwealth,* a factually analogous case, we concluded that the mere fact of a witness's pending indictments in an adjacent county were insufficient to infer that the witness was motivated to testify in an effort to curry favor with the Commonwealth's Attorney. 80 S.W.3d 405, 411 (Ky.2002). The Court in *Bowling* was persuaded by the fact that the prosecuting attorney, in reality, had no jurisdiction to grant any leniency to the witness with respect to charges in another county. "Since there was no connection between [the prosecuting attorney] and the case against [the witness] in Fayette County, the pending Fayette County indictments were not admissible." *Id.* The Court also took note that Bowling offered no evidence that supported his claim that the witness had been offered leniency to testify.

Turning to the present matter, we cannot conclude that the trial court prevented a "reasonably complete" picture of Davenport's veracity, bias, and motivation. At the outset, it must be noted that the prohibition on bias evidence was the only limitation imposed by the trial court; defense counsel was otherwise free to cross-examine Davenport, though choosing to conduct a fairly brief examination. During direct examination, Davenport revealed his prior felony conviction, and that he "has some problems" in his life. On cross-examination, defense counsel's strategy was to establish that the police had intimidated Davenport into making his statement. To this end, defense counsel questioned Davenport about the night he gave his initial statement to the police, and established that Davenport had been taken from bed to give the statement and that the police had shown him a knife. Defense counsel also emphasized that Davenport only gave the statement some two weeks after the incident. However, defense counsel's strategy was stymied somewhat when Davenport could not remember if the police had read him his rights prior to questioning him, and when he denied that the

police had threatened to charge him or had talked about giving him "an out concerning this case."

Of course, central to our analysis is the character of the excluded evidence. On avowal, Davenport testified that he was on active probation in Pulaski County and that he was presently in jail on pending misdemeanor charges in McCreary County. Davenport also stated that no one had moved to revoke his probation in Pulaski County but that, if it were revoked, he would have five years to serve. The Commonwealth asked Davenport if "anyone made [him] promises with regard to [his] testimony and [his] probation up in Pulaski County" to which Davenport responded "no." Therefore, in summary, if no prohibition had been placed on cross-examination, the jury would have learned that Davenport was on active probation in an adjacent county and awaiting misdemeanor charges in the venue county, but that no offer of leniency had been made in exchange for his testimony.

The burden espoused in *Van Arsdall* is whether a "reasonable jury might have received a *significantly* different impression of [Davenport's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." 475 U.S. at 680, 106 S.Ct. at 1436 (emphasis added). Even if Appellant's defense counsel had elicited Davenport's avowal testimony on cross-examination, it is simply too speculative to conclude that the jury would have received a significantly different picture of Davenport. The jury was already aware that Davenport was a convicted felon, that he had "problems" in his life, and that he was clearly reluctant to cooperate with police. The only new information to be learned was that Davenport was also on probation in a neighboring county and had pending misdemeanor charges in the venue county. Of course, it

is fair to assume that if the jury had learned this information, the Commonwealth would have strenuously emphasized that absolutely no offer of leniency had been made. The Commonwealth would likely have emphasized an additional crucial fact: at the time he gave his statement to the police, Davenport had not yet committed or been charged with any misdemeanor in McCreary County, and his statement differed in no way from the testimony he gave at trial.

We must also, though, consider the impact of Davenport's avowal testimony in terms of the entire trial. In rejecting an automatic reversal rule, the *Van Arsdall* Court explained that any Confrontation Clause inquiry must be fact specific: "*Davis* plainly rests on the conclusion that *on the facts of that case,* the error might well have contributed to the guilty verdict." 475 U.S. at 683, 106 S.Ct. at 1437 (emphasis added). In *Davis,* the trial court prohibited evidence that the sole eyewitness, Green, was on probation for burglary. Green had observed the defendants burying a stolen safe on his own property. On direct examination, Green testified that he was not concerned that the police might suspect he was involved in the burglary and denied having ever been the subject of a police interrogation. Recognizing that evidence of Green's probationary status would have directly contradicted this testimony, the Court emphasized that "Green's testimony was 'crucial' and that there was a 'real possibility' that pursuit of the excluded line of impeachment evidence would have done 'serious damage to the strength of the State's case.' " *Id.* (*quoting Davis v. Alaska,* 415 U.S. 308, 319, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974)). Other reviewing courts have been similarly persuaded to reverse when the adverse witness gives testimony that directly contradicts that of another key witness, and when the testi-

mony lacks believable corroboration. *See Commonwealth v. Cox,* 837 S.W.2d 898 (Ky.1992) (finding limitation on cross-examination of key prosecution witness to be error, as witness's testimony directly contradicted that of the victim and was corroborated only by the witness's own family).

Unlike the factual scenario in *Davis,* Davenport lacked an implicit motivation to divert suspicion away from himself: Appellant never attempted to implicate Davenport in the crime, or otherwise identify him as a potential perpetrator. Furthermore, Davenport never gave inconsistent testimony; his testimony at trial differed in no way from the statement he originally gave investigators. Most importantly, Davenport's testimony was corroborated in nearly every material respect. According to his own statement to police, Appellant went to Perkins' home on January 5 to trade his cane for whiskey. He admitted that he left the Wooden Nickel shortly before 8 p.m. and that his nephew drove him to Perkins' home, as Davenport also testified. The physical evidence corroborated Davenport's testimony that a fight occurred—Perkins' home was found in disarray and his arms revealed defensive wounds consistent with a struggle. Randy Hazlett confirmed that Appellant left the Tennessee bar around 7:45, which supported Davenport's claim that Appellant arrived at his home around 8 p.m. Rena Stevens saw a gray van pulling into Perkins' driveway around 8:05, and that it was gone about ten minutes later. This testimony is consistent with Davenport's claim that he dropped his uncle at Perkins' home, heard the fight, and promptly left. And finally, Charlie Stephens corroborated Davenport's testimony that he left Perkins' home and went to the Stephens' household. Mr. Stephens also testified that Davenport was concerned that his uncle had been shot.

Upon a thorough review of the entire record, we determine that the trial court did not err in prohibiting evidence of Davenport's probation in Pulaski County or his pending misdemeanor charges in McCreary County. While a witness's pending charges or probationary status alone may, in some cases, be a satisfactory basis upon which to infer bias, the facts in evidence here were simply insufficient to support the inference of Davenport's bias. Other than the plain fact of Davenport's probationary status, defense counsel offered no evidence whatsoever to support the claim that he was motivated to testify in order to curry favor with authorities. Nor was there any evidence that prosecutors had offered Davenport a "deal" for his testimony. In short, the claim was purely speculative. Furthermore, with respect to evidence of Davenport's pending misdemeanor charges, it must be emphasized that Davenport gave his initial statement to the police prior to being charged with the misdemeanors in McCreary County, and prior to the date of the alleged commission of these misdemeanors. It is patently unreasonable for Appellant to argue that Davenport gave a statement to police in order to curry favor with authorities regarding a misdemeanor he had not yet committed.

■ In Kentucky, the trial court's rulings concerning limits on cross-examination are reviewed for abuse of discretion. *Nunn v. Commonwealth,* 896 S.W.2d 911, 914 (Ky.1995). This Court has long held that trial courts enjoy broad discretion in regulating cross-examination. *Moore v. Commonwealth,* 771 S.W.2d 34, 38 (Ky. 1988). Here, the trial court did not abuse its discretion.

### Cross–Examination of Emma Ross

■ Appellant next argues that the trial court erred in prohibiting defense

counsel from cross-examining Emma Ross regarding her financial status, thereby denying him the right to present a defense of an alternate perpetrator. During cross-examination, Ms. Ross testified that she entered Perkins' home to find him lying on the ground, and only minutes later phoned Phoebe Burke for assistance. However, there were no other witnesses to corroborate Ms. Ross's story, and defense counsel sought to convey to the jury the possibility that Ms. Ross had actually arrived at Perkins' home earlier. Then, in an effort to identify a motive to accompany the alleged opportunity, defense counsel attempted to establish that Ms. Ross killed Perkins because she was in debt at the time of the murder. The trial court did not allow defense counsel to pursue this line of questioning; however, on avowal, it was established that Ms. Ross was in debt to Ford Motor Company at the time of Perkins' death and that she was aware that Perkins usually had substantial amounts of money in his home as a result of his bootlegging and gambling operations. No other restrictions were placed on the cross-examination of Ms. Ross.

 In determining the scope of cross-examination on collateral issues, the trial court must first determine if the proposed cross-examination is relevant pursuant to KRE 402. The trial court must then balance the probative value of the evidence against its prejudicial effect. KRE 403. While this Court has recognized the wide latitude afforded criminal defendants in conducting cross-examination, "a connection must be established between the cross-examination proposed to be undertaken and the facts in evidence." *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky.1997). "A defendant is not at liberty to present unsupported theories in the guise of cross-examination and invite the jury to speculate as to some cause other than one supported by the evidence." *Id.* Here, we conclude that the trial court did not abuse its discretion in limiting the cross-examination of Ms. Ross, as defense counsel failed to establish a satisfactory connection between the proposed testimony and the facts in evidence.

Appellant sought to introduce evidence of Ms. Ross's debts in order to identify her as the murderer, however the record reveals virtually no evidence to support the theory that Ms. Ross killed Perkins. Appellant relies solely on the possibility that Ms. Ross lied about the time she arrived at Perkins' home to assert that she had the opportunity to commit the crime. However, this possibility was supported only by the lack of corroborating evidence. To establish a motive to accompany the alleged opportunity, Appellant relies only on Ms. Ross's outstanding debt. Considering that the vast majority of ordinary citizens are in debt to one or more creditors at any given time, and frequently delinquent in those debts, the relevance of a witness's overdue debt to a leasing company is debatable. Even assuming arguendo that Ms. Ross's financial situation is relevant, such testimony is very likely to confuse and mislead the jury, by allowing the defense to create a theory of the case that is otherwise unsupported by the evidence in the hopes that one juror might be taken in. Therefore, the trial court acted well within its discretion in prohibiting defense counsel from cross-examining Ms. Ross regarding her outstanding debts.

### Testimony of Detective Harrell

 Appellant next cites error where the trial court overruled defense counsel's objection to certain portions of Detective Harrell's testimony. On direct examination, Detective Harrell was asked whether he had experience in assessing people's reactions and how they react under certain circumstances, and whether Ms. Ross's de-

meanor was consistent with the story she had given the officers. He replied affirmatively to both questions. Defense counsel objected to these questions based on hearsay and the form of the question.

■ Appellant now argues that the trial court erred in allowing this line of questioning, because it essentially permitted Detective Harrell to vouch for the credibility or truthfulness of Emma Ross. However, this objection was never presented to the trial judge for consideration, and defense counsel failed to object on the grounds that Detective Harrell was attempting to vouch for Ms. Ross's credibility. "If a party does not timely inform the trial judge of the alleged error and request the relief to which he considers himself entitled, the issue is not preserved for appellate review." *Stringer v. Commonwealth*, 956 S.W.2d 883, 888 (Ky.1997). Therefore, as the issue is not preserved, the ruling of the trial court is affirmed.

### Denial of Funds with which to Hire an Expert

■ Appellant next claims that the trial court committed reversible error by denying defense counsel's motion for funds with which to hire a crime scene investigation expert. KRS 31.110(1)(b) provides that needy defendants charged with serious crimes are entitled to "necessary services and facilities of representation including investigation and other preparation" and the court shall waive the cost of such services. The services to be provided are those that are "reasonably necessary." *Hicks v. Commonwealth*, 670 S.W.2d 837, 838 (Ky.1984). The applicable standard of review of a denial of funds under KRS 31.110 is abuse of discretion, and the reviewing court must limit its analysis to those reasons presented to the trial court. *Dillingham v. Commonwealth*, 995 S.W.2d 377, 381 (Ky.1999).

The basis of defense counsel's motion for funds pursuant to KRS 31.110 was that the investigation into Perkins' death was insufficient and was not conducted pursuant to commonly accepted standards. Defense counsel pointed to numerous procedures and tests that the investigating authorities failed to undertake: Perkins' core temperature was not taken to determine the specific time of death, no effort was made to determine the owners of several weapons found in Perkins' home, and that neither fingerprints nor blood samples were taken from Perkins' home. In other words, defense counsel sought funds with which to hire an expert who would testify as to what *should* have been done by the investigating authorities in this case. The trial court denied the motion for funds, concluding that the stated goal of defense counsel's request—to attack the sufficiency of the investigation procedures—could be reached through cross-examination, and was not specific enough to justify an expenditure of funds.

■ Funds will not be provided pursuant to KRS 31.110 so that defense counsel may conduct a "fishing expedition." *McCracken County Fiscal Court v. Graves*, 885 S.W.2d 307, 314 (Ky.1994). Rather, defense counsel must provide specific information that he or she expects the expert to provide at trial, and the request should be denied where defense counsel is only able to express the need for an expert in general terms. *Simmons v. Commonwealth*, 746 S.W.2d 393, 396 (Ky.1988). A "general" request is precisely the type made by Appellant in the present matter. Despite repeated requests by the trial court, defense counsel was unable to provide any specific reasons why an expert was needed, or any specific information an expert would be able to provide. Rather, defense counsel sought funds for an expert who would undermine the sufficiency of

the investigation. We agree with the trial court that this purpose could be, and in fact was, reached by cross-examination of the investigating officers into what procedures were and were not taken in the investigation. Therefore, the trial court did not abuse its discretion in denying defense counsel's request for funds pursuant to KRS 31.110.

## Failure to Direct a Verdict

Appellant's final claim is that the trial court erred in failing to direct a verdict of acquittal. Appellant argues that the Commonwealth failed to present adequate evidence to support a finding of guilt beyond a reasonable doubt. The standard of review of the denial of a motion for a directed verdict based on insufficient evidence is whether, taking the evidence as a whole, it was clearly unreasonable for a jury to have found the defendant guilty. *Commonwealth v. Benham*, 816 S.W.2d 186, 187–88 (Ky.1991). The evidence presented by the Commonwealth must be of substance, and a directed verdict is warranted where the prosecution provides no more than a "mere scintilla" of evidence. *Id.*

As in his previous arguments, Appellant again points to the alleged insufficiency of the investigation of Perkins' death to justify reversal in this case. Also, Appellant again attacks the credibility of Davenport's testimony. We do not find these arguments compelling. The Commonwealth presented far more than a "mere scintilla" of evidence to the jury in this case. Among the most persuasive evidence is the fact that Appellant himself admitted visiting Perkins on the night in question, and his cane was found beneath Perkins' corpse. Furthermore, Davenport testified to having heard a fight or scuffle inside the home while Appellant was present; the physical state of Perkins' home and defen-

sive wounds found on the body corroborate this testimony. Ruby Davis testified that Appellant arrived at her home on the evening of Perkins' death, claiming to have been at Perkins' home to trade his cane for some whiskey. While Appellant's cane was found at Perkins' home, Davis testified that Appellant was not carrying a bottle of whiskey when he arrived at her home.

It seems that the crux of Appellant's argument is that the case against him was based almost entirely on circumstantial evidence. While clearly it was circumstantial evidence that proved him guilty, this fact does not warrant removing the case from the jury. *Commonwealth v. Collins*, 933 S.W.2d 811, 815 (Ky.1996). A "[c]onviction can be premised on circumstantial evidence of such nature that, based on the whole case, it would not be clearly unreasonable for a jury to find guilt beyond a reasonable doubt." *Graves v. Commonwealth*, 17 S.W.3d 858, 862 (Ky. 2000). In cases such as this, where there is a lack of physical evidence or eyewitnesses, the case should nonetheless be submitted to the jury where "when the various items of evidence are added together, a mosaic appears upon which a reasonable jury could look and conclude that appellant was guilty . . . ." *Davis v. Commonwealth*, 795 S.W.2d 942, 947 (Ky.1990). A mosaic is precisely what the Commonwealth created in this case, through the testimony of several witnesses that corroborated Davenport's incriminating testimony, along with the physical state of Perkins' home and body. Although defense counsel repeatedly pointed out to the jury the scarcity of physical evidence in this case, and adeptly used cross-examination to create the possibility that another person committed this crime, it was not unreasonable for the jury to conclude that Appellant was Perkins' murderer. Reversal is not warranted simply because the jury was not

persuaded by the doubt that defense counsel attempted to create. We find that the verdict in this case was based on the evidence presented at trial and reasonable inferences drawn therefrom. Therefore, the trial court did not err in denying Appellant's motion for a directed verdict.

For the foregoing reasons, the judgment of the McCreary Circuit Court is affirmed.

GRAVES, SCOTT, and WINTERSHEIMER, JJ., concur.

ROACH, J., dissents by separate opinion, with LAMBERT, C.J., and COOPER, J., joining that dissenting opinion.

Dissenting opinion by Justice ROACH.

The trial court erred by failing to allow Appellant (i) to cross-examine Chris Davenport about his probation status and pending charges in other counties, and (ii) to cross-examine Emma Ross about her debts. The first failure was a Confrontation Clause violation, the second a Due Process violation, and these errors are sufficient to require reversal of Appellant's conviction.

## I. CROSS–EXAMINATION OF CHRIS DAVENPORT

The United States Supreme Court has explained that the "primary interest secured by [the Confrontation Clause of the United States Constitution] is the right of cross-examination." *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). In describing the importance of cross-examination as a means of questioning a witness's credibility, the Court has explained:

A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony. We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

*Davis v. Alaska,* 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (citations, internal quotation marks, and footnote omitted). In *Davis,* the Court specifically concluded that the trial court's refusal to allow the defendant to reveal that a key prosecution witness (who provided the crucial link between the defendant and the crime) was on probation denied the defendant "the right of effective cross-examination which would be constitutional error of the first magnitude ...." *Id.* at 318, 94 S.Ct. at 1111 (internal quotations and citations omitted).

Similarly, when the trial court prevented Appellant from asking Chris Davenport whether he was on probation from a Pulaski County conviction and in jail on misdemeanor charges in McCreary County, the trial court prevented Appellant from engaging in effective cross-examination. As Professor Lawson has pointed out: "No doubt exists about the admissibility of evidence bearing on what is commonly referred to as the 'bias' of the witnesses." Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 4.15, at 183 (3d ed.1993). Although "[t]here is no explicit treatment of impeachment by bias in the Kentucky Rules of Evidence," the "[a]dmissibility of such evidence ... is governed by the provisions on relevancy (Rules 401 and 402)." *Id.* Professor Lawson explicitly mentions that this Court has determined that defendants have the right to introduce evidence "that a witness has

charges pending and is thus motivated to color testimony to please authorities" and "that a witness is on probation or parole under active supervision." *Id.* at 185. Appellant's failure to offer specific evidence that Chris Davenport had "made a deal" or had been guaranteed leniency in his other cases should go to the weight of the evidence as to bias, not its admissibility. The fact of the matter is that the jury can infer from testimony about a witness's other charges and probation status that the witness might be testifying for the prosecution in order to curry favor, even if that favor were only to have the prosecutor speak favorably to another prosecutor on the witness's behalf. Consequently, I believe the trial court abused its discretion in limiting the cross-examination of Chris Davenport.

However, the majority is correct that finding the trial court abused its discretion does not end the inquiry. Violations of the Confrontation Clause, including the specific type alleged here, are subject to review for harmless error. *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The United States Supreme Court described the harmless error analysis as follows:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted,

and, of course, the overall strength of the prosecution's case.

*Id.* at 684, 106 S.Ct at 1438.

In *Davis,* the witness provided the crucial link between the criminal activity and the defendant; Chris Davenport played a similar role in Appellant's trial. Chris Davenport's testimony was not cumulative. He gave the only direct testimony-placing Appellant at the scene,[1] and he gave the only testimony that Appellant entered the house, that it sounded like a fight broke out, and that a man then screamed, "Please don't kill me." Overall, the prosecution's case against Appellant hinged on two key elements: Chris Davenport's testimony and evidence that the cane found beside Perkins's body belonged to Appellant. Chris Davenport's testimony was clearly of fundamental importance to the Commonwealth's case.

The trial court's refusal to allow Appellant to develop evidence of Chris Davenport's possibly biased testimony may have resulted in a misinformed judgment by the jury as to the proper weight to afford that evidence. More importantly, given the crucial nature of Chris Davenport's testimony, evidence that he may have had an ulterior motive for testifying could have seriously affected the jury's determination of Appellant's guilt. Thus, I cannot say that the trial court's refusal to admit this evidence of Chris Davenport's bias was harmless error.

## II. CROSS–EXAMINATION OF EMMA ROSS

I also believe that the majority is incorrect in concluding there was no error in limiting Appellant's cross-examination of Emma Ross.

---

1. Chris Davenport testified that he dropped Appellant off at the victim's house. A tape of a police interview with Appellant was also introduced wherein he admitted that he had been at the victim's home.

The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. This right, often termed the right to present a defense is firmly ingrained in Kentucky jurisprudence, and has been recognized repeatedly by the United States Supreme Court.

*Beaty v. Commonwealth,* 125 S.W.3d 196, 206 (Ky.2003) (internal citations and quotation marks omitted).

On cross-examination, Appellant wanted to establish that Ross had a motive for killing Perkins. Another witness testified that Ross, who was involved with another man, was Perkins's girlfriend and that she knew that Perkins carried large amounts of cash. The jury had also heard testimony from which it could infer that Ross was at Perkins's residence for two hours before she called for help. Appellant wanted to reveal that Ross owed at least two debts, one which was substantial and for which she had been sued and another for which she had not been sued.

By denying Appellant the right to introduce evidence that tended to show that Ross had a motive to kill Perkins, the trial court essentially short-circuited Appellant's defense that an alleged alternative perpetrator, i.e., "aaltperp," committed the murder. *See Beaty,* 125 S.W.3d at 207. This Court, drawing on the wisdom of Wigmore, recently said that:

> "[I]f the evidence [that the crime was committed by someone else] is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt."

*Id.* at 209 (alterations in original) (quoting 1A John Henry Wigmore, *Evidence in Tri-*als at *Common Law* § 139 (Tiller's rev. 1983)).

Having already heard evidence that Ross was dating two men at the same time, that Ross was at Perkins's residence for two hours before calling for help, and that Ross knew that Perkins typically kept large amounts of cash on hand, the jury would not have been misled by additional evidence that Ross owed at least one substantial debt and had been sued over it. And given that context, I cannot conclude that Appellant's theory was "purely speculative and fantastic." But without this last item of evidence of Ross's potential motive, Appellant's defense was incomplete and his right to due process of law was denied. "It has been uniformly held by this court that one accused of a crime may introduce evidence tending to prove that the crime was committed by another," *Harvey v. Commonwealth,* 266 Ky. 789, 100 S.W.2d 829, 830 (1937), especially where a motive is coupled with an opportunity to commit the crime. *Beaty,* 125 S.W.3d at 208 ("In a homicide case, a defendant is not entitled to parade before the jury every person who bore some dislike for the victim without showing that the 'aaltperps' at least had an opportunity to commit the murder."). Here, Appellant had evidence of that crucial congruence of motive and opportunity, but the trial court refused to admit it. I believe this was error.

### III. CONCLUSION

Clearly, the combined impact of denying Appellant the right to cross-examine Chris Davenport and Emma Ross cannot be said to be harmless beyond a reasonable doubt. Therefore, I respectfully dissent.

LAMBERT, C.J. and COOPER, J., join this dissenting opinion.