# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0520-MR

JEFFREY SCOTT TAYLOR                                         APPELLANT

V.                      ON APPEAL FROM LAUREL CIRCUIT COURT
HONORABLE MICHAEL O. CAPERTON, JUDGE
NO. 17-CR-00190-001

COMMONWEALTH OF KENTUCKY                        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Jeffrey Scott Taylor appeals from his conviction by the Laurel Circuit Court after a jury trial in which he was convicted of the murder of his girlfriend, Shannon Saylor[1], and tampering with physical evidence. On appeal, Taylor argues the trial court committed reversible error by not allowing him to fully cross examine a witness, Susie Scalf, on her involvement in local drug trafficking. Finding no error, we affirm.

## I. FACTUAL AND LEGAL BACKGROUND

Saylor and Taylor were friends with married couple Boyd Simpson and Susie Scalf. In March 2017, Saylor and Simpson borrowed Taylor's truck and

---

[1] The Indictment in this case names the victim as Shannon Vaughn Saylor. The Commonwealth refers to the victim by the name Shannon Vaughn in its brief but for purposes of this opinion, we will use the name Shannon Saylor, or "Saylor."

drove around hoping to find someone to sell them methamphetamine. Taylor contacted Scalf to find out where Saylor and Simpson were and Scalf informed him that the two were looking for drugs and she, too, wanted to find them. After Scalf reached Simpson by phone, Scalf picked up Taylor and his friend Wendell Farmer and drove to meet up with Saylor and Simpson at a gas station. At the gas station, there was an altercation between Scalf and Saylor. After the altercation, Simpson and Scalf returned home.

Farmer and Saylor rode with Taylor to Taylor's father's home. Farmer went inside to use the bathroom and when he came out, he saw Saylor on the ground and witnessed Taylor throw a large rock at Saylor's head. Farmer observed blood coming out of Saylor's face and mouth. Farmer left the scene but did not report the matter to authorities.

Approximately an hour later, Taylor called Simpson and Scalf. Kristen Scalf Miller, Scalf's sister-in-law, was able to listen to this conversation and would later report what she heard to the police. During the call, Scalf was concerned Saylor was going to contact police about the assault at the gas station but Taylor informed Scalf that Saylor was "not going to be calling the law on anybody" and that he "had killed her" and would be coming over in twenty minutes. After Taylor arrived, Miller was able to again listen to their conversation and heard Taylor tell Scalf and Simpson that he had "hit her with a rock and flattened her head."

At the time, Taylor was not yet sure if Saylor was dead and asked Simpson and Scalf to return with him to her body which he had taken into the

2

woods. There, Scalf stayed in the vehicle while Simpson and Taylor went to view Saylor's body. Upon his return, Simpson informed Scalf that there was "no chance" that Saylor was still alive. Taylor stayed that night with Simpson and Scalf and then next morning Scalf witnessed Taylor cleaning out his truck in their driveway. For several weeks Scalf remained silent about what had occurred but finally told her brother who called police.

In the interim, Taylor told Chris Duff that he "didn't know he could make a head a pancake." At the time Duff did not know that Saylor was missing, but after learning from Saylor's sister she was, he too contacted police. Taylor also took Matthew Caldwell, whom he had met through a mutual friend Chad Bowling, to Saylor's body, told him he had killed her, and asked him to help him cover the body with rocks and tree branches. Caldwell did not immediately contact police alleging that he was afraid of being charged, but later did so and took police to the location of Saylor's body.

When Taylor was questioned by police, he informed them that he had broken up a fight between Scalf and Saylor and that he had later tried to drive Saylor to Scalf's home for an apology. However, on the way to Scalf's, Saylor became upset when Taylor refused to pick up some methamphetamine, got out of the vehicle, and walked off. Taylor said he never saw her again.

Taylor was indicted for murder and tampering with physical evidence and, following a jury trial, was found guilty of both charges. The trial court sentenced Taylor in accordance with the jury's recommendation to twenty-five years for

3

murder and five years for tampering with physical evidence to be served consecutively for a total of thirty years in prison.

## II. LEGAL ANALYSIS

Taylor's only argument on appeal is that the trial court committed reversible error by not allowing him to cross-examine Scalf regarding allegations of her trafficking methamphetamine.

### A. Was the Trial Court's Refusal to Allow Taylor to Question Scalf Regarding Allegations of Drug Trafficking an Abuse of Discretion and did it Deny Taylor's Rights of Due Process? – Preserved

Taylor argues that the trial court abused its discretion and deprived him of his due process rights by excluding testimony Taylor wished to elicit from Scalf relative to allegations of her involvement in drug trafficking.

On review, we recognize the admission of evidence to be vested within the trial court's discretion. *Doneghy v. Commonwealth*, 410 S.W.3d 95, 109 (Ky. 2013). A trial court's decision to admit evidence will not be disturbed absent a showing of an abuse of discretion. *Matthews v. Commonwealth*, 163 S.W.3d 11, 19 (Ky. 2005). We define abuse of discretion as a court acting arbitrarily, unreasonably, unfairly, or in a manner "unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)

During Scalf's questioning by the Commonwealth, she testified that she was participating in drug court and was trying to remain sober. The Commonwealth also asked Scalf if she was a convicted felon to which she responded affirmatively.

4

On cross examination, Taylor's counsel asked Scalf if she battled with drug addiction which she admitted. Taylor's counsel then asked Scalf if she had relapsed to which the Commonwealth objected. At a bench conference, Taylor's counsel first argued that he should be allowed to impeach Scalf on her drug use since it could potentially affect her ability to recall events. The trial court refused that request. Taylor's counsel also argued that he could cross-examine Scalf about her and Simpson being involved in drug trafficking under the theory that Scalf and Simpson sold drugs to, and used drugs with, Caldwell and Bowling. Bowling had passed away by the time of the trial, but Taylor's counsel wanted to explore the parties' connections, if any, with the death of Saylor. Taylor's counsel also argued that such questioning would go to impeachment as it might reveal a motive for Scalf being untruthful. Taylor argued that his theory of the case was that Caldwell and Bowling were taken to Scalf and Simpson's residence to buy meth and that Caldwell had a motive to help his meth dealers (Scalf and Simpson) by testifying against Taylor. According to Taylor, Scalf might also have had a motive to testify to help Caldwell, and Taylor's further theory was that during their fight, Scalf may have been the one to have struck the fatal blow to Saylor.

The trial court decided that Taylor's counsel could ask Scalf if she knew either Caldwell or Bowling but if Scalf denied knowing either, then questioning on the subject would end. However, if Scalf knew either of the men, counsel could ask her how she knew them and if it was from trafficking drugs. However, Taylor's counsel could not begin his inquiry by asking her if she

5

trafficked drugs. The trial court also asked Taylor's counsel if he had a witness who was going to testify that Scalf trafficked in drugs, and Taylor's counsel responded "[p]robably not" other than evidence from prior convictions for Scalf and Bowling related to drug trafficking.

When Taylor's counsel asked whether she knew Bowling or Caldwell she said, "[n]o." Scalf was also asked if she was on probation or parole to which she also responded, "[n]o." The trial court allowed Taylor's counsel to take avowal testimony of Scalf during the lunch break. In that testimony, Scalf admitted that she and Simpson had sold drugs from their home, that they had sold methamphetamine to people she didn't know, and that she could not confirm or deny if they had sold drugs to Caldwell and people were coming in and out of their house all the time.

The trial court agreed that Scalf could remain subject to recall if Taylor's counsel could provide caselaw persuading him to allow additional testimony into evidence. However, Taylor's counsel did not recall Scalf to testify in Taylor's defense and provided no caselaw or additional arguments to support either recalling Scalf or furnishing her avowal testimony to the jury.

On appeal, Taylor argues that "[Scalf] and [Simpson's] drug dealing might not seem to be related but each witness in the case had something in common, they all used meth" and "[Scalf] and [Simpson] were directly involved with [Saylor's] disappearance" further noting that Scalf had some of Saylor's clothes in the trunk of her car that she burned after Saylor was dead and kept quiet about Saylor's death "for weeks." According to Taylor, Scalf "being a drug

6

dealer in the local area [and] having possible connections to the other witnesses had direct bearing on whether her testimony was truthful and whether she had a motivation to testify against Taylor to protect Caldwell or someone else."

According to Taylor, the trial court was not permitted to deny him the right to fully cross-examine Scalf on matters bearing on her credibility "when it significantly undermine[s] fundamental elements of the defendant's defense" and cannot apply evidentiary rules in such a way as to deprive defendants of due process, citing to *McPherson v. Commonwealth*, 360 S.W.3d 207, 214 (Ky. 2012).

"[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Davenport v. Commonwealth*, 177 S.W.3d 763, 768 (Ky. 2005) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). As we stated in *Newcomb v. Commonwealth*, 410 S.W.3d 63, 85 (Ky. 2013), "[t]he right to cross-examine witnesses is . . . '[a]n essential aspect of the Sixth Amendment Confrontation Clause[,]' " "[b]ut that right 'is not absolute'[,] . . . and [our] trial courts have broad discretion 'to impose reasonable limits on such cross-examinations[.]' " (quoting Davenport, 177 S.W.3d at 767; Van Arsdall, 475. U.S. at 679).

Under KRE 608(b), a witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction, but only if that act is "probative of truthfulness or untruthfulness," and only if "the cross-examiner has a

factual basis for the subject matter of his inquiry." *Rogers v. Commonwealth,* 366 S.W.3d at 446, 454-55 (Ky. 2012). Further, "[t]he rule vests the trial court with broad discretion in its application, and in exercising that discretion the court should assess both the sufficiency of the examiner's factual predicate as well as the prior bad act's relevance to the witness's 'truthfulness or untruthfulness.'" *Id.*

In this instance, we cannot say that the trial court's decision to limit Taylor's questioning of Scalf was an abuse of discretion or violated Taylor's rights to confrontation. The presence of, and use of, methamphetamine by many of the participants in this matter was made quite clear to the jurors through the direct testimony of witnesses called by the Commonwealth. Taylor was unable to provide any witnesses of his own or develop any testimony during cross-examinations of the Commonwealth's witnesses to support the notion that Scalf was dealing close in time to when Saylor was murdered. In fact, Taylor called no witnesses in his defense.

Even if Scalf had testified she was trafficking in drugs around the time of Saylor's murder, we are not persuaded this would have changed the jury's ultimate decision. Taylor had opportunities to develop any alternative theories he wished to explore or present through cross-examination of the Commonwealth's witnesses, each of which carried their own baggage with them to Taylor's trial. Despite such opportunity, the overwhelming weight of the evidence, in fact all of the evidence, presented at Taylor's trial served to prove

8

that Taylor alone murdered Saylor and that he attempted to cover up her murder by relocating and concealing her body.

We find nothing in the record of Taylor's trial or within his appeal that would make us question the trial court's actions in this matter. The trial court acted appropriately and well within its discretion to limit Taylor's examination of Scalf to avoid unnecessary questioning on matters both irrelevant and collateral to the real issues before the jury.

### III. CONCLUSION

We affirm Taylor's convictions and sentences by the Laurel Circuit Court. All sitting. All concur.

COUNSEL FOR APPELLANT:

Adam Meyer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Thomas A. Van De Rostyne
Assistant Attorney General