# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

**THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.**

RENDERED: APRIL 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0132-MR

TIMOTHY R. MAYS                                                 APPELLANT

V.                   ON APPEAL FROM MARION CIRCUIT COURT
HONORABLE SAMUEL TODD SPALDING, JUDGE
NO. 20-CR-00076

COMMONWEALTH OF KENTUCKY                        APPELLEE

## MEMORANDUM OPINION OF THE COURT

## AFFIRMING

A jury of the Marion Circuit Court found Appellant Timothy R. Mays guilty of murder, tampering with physical evidence, and violation of a Kentucky interpersonal order of protection ("IPO"). The jury recommended a total sentence of life without the possibility of parole for 25 years. The trial court sentenced in accordance with that recommendation. Mays now appeals to this Court as a matter of right. Ky. Const. § 110(2)(b). After careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mays and Nina Hunt began dating in August 2019. The relationship was tumultuous and almost immediately marred by domestic violence. During the course of the relationship, Hunt's daughters observed injuries on her including bruising and black eyes. In one instance, Hunt also went to the hospital with

broken ribs. Hunt thereafter obtained an IPO against Mays, and also obtained a gun from a friend. The gun later went missing from her residence.

On April 2, 2020, Hunt ended her relationship with Mays. Mays then called Hunt incessantly for the next three days, leaving her forty voicemails over the course of that short time.

On April 5, 2020, Mays was with his daughter Dawn, who testified that he was upset, pacing back and forth, and refused to speak to her. He then got in his car and drove away. Security camera footage showed Mays' car pull into Hunt's driveway, at which time Hunt texted her daughter Paige and said "he's here!!!!" Paige immediately began driving to her mother's residence.

The security camera footage showed Mays' car leaving Hunt's residence fifteen minutes after his arrival. Paige arrived three minutes later, could not get into the residence, and called 911. Law enforcement arrived, broke into the home, and discovered Hunt lying near the back door with a gunshot wound to her head. Hunt was alive and taken to the hospital, where she died two days later.

On the evening of the shooting, law enforcement obtained a search warrant, found Mays at home sleeping, and arrested him. During a search of his residence, law enforcement located a gun hidden behind an access panel to the furnace. Laboratory testing later identified a bullet found at the crime scene as having been fired from this gun.

Mays was ultimately charged with murder, tampering with physical evidence, and violation of a Kentucky IPO. After an evidentiary hearing, the

2

trial court found Mays suffered a serious intellectual disability and was thus ineligible for the death penalty. At trial, the jury found him guilty on all three counts and recommended a sentence of life without the possibility of parole for 25 years on the murder conviction, 5 years on the tampering conviction, and 12 months on the violation of an IPO conviction. The trial court imposed a concurrent sentence of life without the possibility of parole for 25 years. Mays now appeals as a matter of right.

## ANALYSIS

Mays raises six issues for our review: (1) whether he was denied a right to a fair trial when the trial court and Commonwealth's counsel had an *ex parte* conversation regarding a witness's refusal to testify due to an outstanding fine; (2) whether the prosecutor engaged in flagrant misconduct; (3) whether the trial court erred in declining to give an extreme emotional disturbance ("EED") instruction; (4) whether the trial court erred in allowing a physician to testify that Hunt told him Mays had injured her; (5) whether Mays' right to a fair trial was violated by a law enforcement officer's reference during testimony to Mays' status as a convicted felon; and (6) whether reversal is warranted for cumulative error. We review each issue in turn, providing additional facts as necessary.

### I. The Trial Court's *Ex Parte* Conversation With The Prosecution Did Not Violate Mays' Right To A Fair Trial.

Mays' first allegation of error relates to an *ex parte* conversation between the trial court and the Commonwealth's counsel regarding the refusal of Hunt's

daughter Haley to testify at trial. On the first day of trial, the Court conducted voir dire and then recessed for lunch. Two minutes later the Commonwealth approached the bench without defense counsel present and advised the trial court that Haley was unwilling to testify because she had an outstanding fine and did not want to be arrested. The trial court responded that Haley would not be arrested for the fine, and instructed someone off camera (presumably the bailiff) not to serve the warrant on Haley. The prosecution did not inform Mays' counsel about the conversation. Haley testified later that afternoon.

Mays contends this *ex parte* conversation violated his right to a fair trial in a number of ways. First, Mays contends his Confrontation Clause rights were violated because he was not informed of the conversation, leaving him unable to cross-examine Haley as to any potential bias in favor of the Commonwealth arising from the trial court's decision not to enforce the warrant at that time. Second, Mays asserts the *ex parte* conversation also violated his right to be present at critical stages of trial. Finally, Mays also maintains the prosecutor's failure to disclose the conversation was a *Brady* violation.

Mays acknowledges this issue is unpreserved, and therefore requests palpable error review pursuant to RCr[1] 10.26. Under RCr 10.26, "[a] palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that

---

[1] Rule of Criminal Procedure.

4

manifest injustice has resulted from the error." In determining whether an error is palpable, we consider

> "whether on the whole case there is a substantial possibility that the result would have been any different." To be palpable, an error must be "easily perceptible, plain, obvious and readily noticeable." A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings. "It should be so egregious that it jumps off the page . . . and cries out for relief."

*Davis v. Commonwealth*, 620 S.W.3d 16, 30 (Ky. 2021) (citations omitted). Even where an error is palpable and thus meets this standard, however, relief is warranted only where the error also results in manifest injustice. *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018). An error results in manifest injustice if it "so seriously affected the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Conrad v. Commonwealth*, 534 S.W.3d 779, 783 (Ky. 2017) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006)).

### A. Mays' Confrontation Clause Rights Were Not Violated.

"The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). This right secures for the defendant an opportunity for cross-examination, one important function of which is "the exposure of a witness' motivation in testifying." *Id.* (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)). A right to reveal "possible biases, prejudices, or ulterior motives of the witness as they may relate to the issues . . . in the case at hand" through effective cross-examination is fundamental to a fair trial. *Commonwealth v. Armstrong*, 556

5

S.W.3d 595, 600 (Ky. 2018) (quoting *Davis*, 415 U.S. at 316); *Williams v. Commonwealth*, 569 S.W.2d 139, 145 (Ky. 1978). Indeed, "a showing of bias can be particularly important in cross-examination because, unlike other forms of impeachment 'which might indicate that the witness is lying[,] evidence of bias suggests *why* the witness might be lying.'" *Armstrong*, 556 S.W.3d at 602 n.17 (quoting *Star v. Commonwealth*, 313 S.W.3d 30, 38 (Ky. 2010)).

While defendants are thus assured of a right to conduct effective cross-examination, that does not mean trial judges are unable to impose limits on inquiries into a witness's potential bias. To the contrary, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. "So long as a reasonably complete picture of the witness' veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Davenport v. Commonwealth*, 177 S.W.3d 763, 768 (Ky. 2005) (quoting *Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky. 1997)).

A Confrontation Clause violation occurs when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Olden v. Kentucky*, 488 U.S. 227, 231 (1988) (quoting *Van Arsdall*, 475 U.S. at 680). A defendant satisfies his burden

6

of establishing such a violation by showing that "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [the defense's] counsel been permitted to pursue" the desired cross-examination. *Armstrong*, 556 S.W.3d at 603 (quoting *Van Arsdall*, 475 U.S. at 680).

Notably, courts have found this burden met when the cross-examination the defendant was unable to conduct would "clearly support[] an inference that the witness was biased, and when the potential for bias exceeds mere speculation." *Id.* (quoting *Davenport*, 177 S.W.3d at 769). Of course, as a corollary, a defendant's allegation of a Confrontation Clause violation fails where his contention that cross-examination might have revealed bias is based on nothing more than mere speculation and unsupported by credible evidence supporting an inference of bias. *Id.*; *Davenport*, 177 S.W.3d at 769.

Here, Mays' assertion that evidence of Haley's treatment by the trial court could be used to show potential bias in favor of the Commonwealth is based on mere speculation and unsupported by credible evidence that could support an inference of such bias. First, the record shows that the Commonwealth's counsel simply informed the trial court that Haley refused to appear due to her outstanding fine. There was no request by Commonwealth's counsel that Haley receive any favorable treatment. Rather, the trial court itself sua sponte directed the warrant not be served on Haley at that time. It thus appears that any favorable treatment enjoyed by Haley was at the trial

7

court's sua sponte direction rather than by request of the Commonwealth.[2] That the *trial court* directed a temporary reprieve from the warrant—without any request by the Commonwealth to do so—in no way supports an inference Haley might have been biased in favor of *the Commonwealth.*

Second, the favorable treatment of Haley—if any—was also of a temporary nature, consisting solely of the trial court's direction that the warrant for a fine not be served on her at trial. Thus, given that Haley enjoyed only a temporary reprieve from the warrant at the sua sponte direction of the trial court, Mays' contention that such treatment may have led Haley to be biased in favor of the Commonwealth is not only mere speculation, but demonstrably refuted by the record. Notably, Mays also points us to no other evidence that could otherwise support an inference that Haley's treatment could support a finding of bias in the Commonwealth's favor. As such, we find no Confrontation Clause violation arising from the trial court's *ex parte* conversation with the Commonwealth regarding Haley's appearance at trial.

We further note that even if we were to find that Mays has shown a Confrontation Clause violation, the violation would not rise to the level of reversible error.

> A trial court's improper denial of the defendant's opportunity to impeach a witness for bias is subject to harmless error analysis. Because the error is of constitutional significance, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." Therefore, the error is harmless beyond a reasonable

---

[2] Indeed, in his briefing before this Court, Mays himself states "the jury was entitled to hear about the leniency given to [Haley] *by the court.*" (Emphasis added).

doubt if there is no "reasonable possibility that exclusion of the evidence complained of might have contributed to the conviction."

*Armstrong*, 556 S.W.3d at 604 (citations omitted). Courts consider a number of factors in determining whether the improper denial of a defendant's opportunity to impeach a witness for bias is harmless beyond a reasonable doubt. These factors include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of the cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Olden*, 488 U.S. at 233 (quoting *Van Arsdall*, 475 U.S. at 684).

Here, while Haley's testimony was undoubtedly significant given that she was one of the victim's daughters, it was not the crux of the prosecution's case. Her testimony was largely limited to the historical context of Hunt's relationship with Mays, in contrast with Paige's testimony that covered that issue as well as additional topics of serving as her mother's contact in times of distress with Mays and the discovery of her mother's body shortly after the shooting. Haley's testimony was also largely cumulative of Paige's testimony, with two minor and insubstantial differences. First, while Paige testified someone stole Hunt's gun, Haley testified Mays stole it. While Haley's more specific testimony that *Mays* stole Hunt's gun might appear at first blush to have more than minor significance, that significance is diminished by the fact that Haley acknowledged on cross-examination she was merely assuming Mays stole Hunt's gun. Second, Haley testified Mays messed with and stole Hunt's

9

security cameras, while Paige testified only that Mays stole them. Haley's testimony was also consistent with and corroborated by Paige's testimony. This significantly undercuts any suggestion that Haley's testimony was the product of bias due to her treatment by the trial court. In addition, Mays' counsel was able to and did cross-examine Haley.

Finally, the prosecution's case against Mays was unquestionably strong, even without considering Haley's testimony. The evidence at trial showed that Mays and Hunt had a turbulent relationship rife with domestic violence, and that Hunt ended that relationship and ceased communicating with Mays three days before the murder. Over those three days, Mays nonetheless persisted in repeatedly calling Hunt, ultimately leaving her forty voicemail messages in that short span of time. Paige testified that Hunt feared Mays and that Hunt repeatedly asked her to check in to make sure she was safe. In addition, security footage showed Mays' vehicle arriving at the residence around the time of the killing and leaving shortly thereafter. Finally, laboratory testimony identified a bullet found at the crime scene as having been fired by a gun discovered hidden in Mays' home.

Given the strength of this evidence and the overall case against Mays, as well as the other factors considered, we cannot conclude that Mays' inability to cross-examine Haley regarding her treatment by the trial court in any way contributed to his conviction. As such, even if Mays' Confrontation Clause rights had been violated, any such error would have been harmless beyond a reasonable doubt.

10

**B. Mays' Right To Be Present At Critical Stages Was Not Violated.**

Mays next asserts the trial court's *ex parte* communication with the Commonwealth about Haley's fine and warrant violated his right to be present at all critical stages of trial. RCr 8.28(1) provides that a criminal defendant "shall be present at . . . every critical stage of the trial[.]" In determining whether proceedings constitute a "critical stage of the trial," we ask "whether there has been any interference with the defendant's opportunity for effective cross-examination." *Cantrell v. Commonwealth*, 288 S.W.3d 291, 297 (Ky. 2009) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 744 n.17 (1987)).

We pause to note that the *ex parte* conversation between the trial court and the prosecution was at best inadvisable. The Kentucky Rules of Professional Conduct applicable to attorneys and the Kentucky Code of Judicial Conduct both generally prohibit lawyers and judges, respectively, from engaging in *ex parte* communications. SCR[3] 3.130(3.5)(b); SCR 4.300, Canon 2, Rule 2.9. Here, there appears no reason the conversation between the judge and the prosecutor should have been conducted outside the presence of Mays' counsel. We admonish the judges and attorneys of the Commonwealth to remain mindful of their ethical obligations and to avoid unnecessary *ex parte* communications whenever possible unless otherwise authorized by the relevant Rules.

Nonetheless, Mays' contention that Haley's treatment by the trial court may have biased her in favor of the Commonwealth is mere speculation

---

[3] Supreme Court Rule.

11

contrary to the record and unsupported by credible evidence. There is simply no basis to support an inference that either the *ex parte* conversation between the trial court and the prosecution or the resulting temporary reprieve of the warrant may have led Haley to be biased in favor of the Commonwealth. As such, it cannot be said that Mays' absence from that conversation in any way interfered with his opportunity for effective cross-examination. Thus, Mays was not denied his RCr 8.28 right to be present at all critical stages of the trial.

### C. There Was No *Brady* Violation.

Finally, Mays asserts the prosecutor's failure to inform his counsel of her *ex parte* conversation with the trial court constitutes a *Brady* violation. Again, we disagree.

Under *Brady*, a prosecutor's suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This includes "indirectly exculpatory" evidence that "impeaches the credibility of a witness whose testimony may be determinative of guilt or innocence." *Williams*, 569 S.W.2d at 143. One form of such evidence is proof of a deal or promise of leniency to a witness, given the value of such evidence "to the accused to show that the witness possessed a motive to fabricate." *Id.*

Notably, however, *Brady* is violated only if the evidence the prosecution fails to disclose is *material. Brady*, 373 U.S. at 87. For *Brady* purposes, evidence is material

12

only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the trial would have been different. . . . [I]n the context of this different result consideration, a reasonable probability [is] one sufficient to undermine confidence in the outcome.

. . .

"The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

*Benjamin v. Commonwealth*, 266 S.W.3d 775, 780 (Ky. 2008) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Even considered in the light most favorable to Mays, the evidence the prosecutor failed to disclose was simply that the trial court directed a temporary reprieve from the warrant so Haley would testify. Such evidence in no way establishes or even suggests Haley may have been biased in favor of the Commonwealth. Moreover, Haley's testimony was in any event cumulative of and corroborated by Paige's testimony. And as discussed above, the evidence against Mays was strong. As such, evidence regarding Haley's treatment by the trial court was wholly immaterial and the prosecutor's failure to disclose that treatment or the *ex parte* conversation in no way leads us to question whether the jury's verdict is worthy of confidence. Thus, because we perceive no violation of Mays' Confrontation Clause rights, RCr 8.28, or *Brady*, reversal on those grounds is not warranted.

## II. The Prosecutor's Alleged Misconduct, If Any, Was Not Flagrant And Does Not Warrant Reversal.

Mays next asserts reversal is warranted on grounds of two separate incidents of purported prosecutorial misconduct during trial. First, during the

guilt-phase closing arguments the prosecutor addressed Hunt's daughter Paige directly, stating "Paige, you did a darn good job. You saved her many times. You told us about the times that you went there and picked her up and got her out of that situation." The prosecutor then turned to the jury and said "She did her best. She missed it by less than three minutes. But she just couldn't protect this time."

Second, Mays called Dr. Martine Turns during the penalty phase to testify in mitigation regarding Mays' intellectual disability. The Commonwealth cross-examined Dr. Turns. In the penalty-phase closing arguments, the prosecutor told the jury she did not agree with Dr. Turns that Mays had an intellectual disability:

> She just told you he suffered from an intellectual disability. Which again, I cross-examined and disagreed with her on several aspects of it. The way she conducted the test by using a previous psychologist upon which he had hired. I just disagreed and we looked at her school records. She gave you what those test findings were. We already knew what those were. Obviously, we talked about previous testimony. We knew that they were in the range that I disagreed with. I'm not a trained psychologist, but I wanted you all to hear it because I feel differently, and I didn't know if you all would or not either.

Mays acknowledges that his contention these incidents constitute prosecutorial misconduct is unpreserved, and he thus requests palpable error review under RCr 10.26.

For unpreserved allegations of prosecutorial misconduct, we reverse only if the conduct was both flagrant and palpable error resulting in manifest injustice. RCr 10.26; *Matheney v. Commonwealth*, 191 S.W.3d 599, 606, 607 n.4 (Ky. 2006). To determine if the misconduct is flagrant, we consider "(1)

14

whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *Mayo v. Commonwealth*, 322 S.W.3d 41, 56 (Ky. 2010) (quoting *Hannah v. Commonwealth*, 306 S.W.3d 509, 518 (Ky. 2010)).

Mays asserts the prosecutor's direct address to Paige and her comments that Paige did a "darn good job" and saved her mother many times, before turning to the jury and stating Paige did her best but missed the opportunity to save her mother by three minutes, was victim impact evidence improperly introduced during the guilt phase of the trial. We have held that the introduction of victim impact evidence during the guilt phase is reversible error. *Ernst v. Commonwealth*, 160 S.W.3d 744, 763 (Ky. 2005), *declined to follow on other ground by Mason v. Commonwealth*, 559 S.W.3d 337 (Ky. 2018). However, we have also held that prosecutors have latitude to "introduce evidence in the guilt phase identifying a victim as a living person rather than a simple statistic" because such victim background evidence "does not unduly prejudice a defendant 'as long as the victim is not glorified or enlarged.'" *Id.* (quoting *Bowling v. Commonwealth*, 942 S.W.2d 293, 302-03 (Ky. 1997)). "Victim impact evidence differs from victim background evidence, in that the former is 'generally intended to arouse sympathy for the families of the victims, which, although relevant to the issue of penalty, is largely irrelevant to the issue of guilt or innocence.'" *Id.* (quoting *Bennett v. Commonwealth*, 978 S.W.2d 322, 325-26 (Ky. 1998)).

15

Here, misconduct in the prosecutor's statement, if any, was minimal. The statement was largely a repetition of facts from the evidence presented at trial, namely that Paige had to help her mother on many occasions but was unable to do so on the day of the murder. Admittedly, the prosecutor's addressing of the beginning of these comments directly to Paige and her statement that Paige did "a darn good job" were gratuitous and likely strayed from the proper role of the prosecutor in presenting the facts of the case to the jury. However, we do not find that they rise to the level of conduct misleading or prejudicial to Mays. The comments were also isolated and short in length, lasting approximately thirty seconds during the three-day trial. They also do not appear to be a deliberate attempt to prejudice Mays. Rather, the evident thrust of the statements was to bring back to the jury's mind the fact of Hunt's repeated need for Paige's assistance in dealing with Mays' violence rather than to arouse sympathy for Paige or Hunt as victims. Finally, as noted above, the strength of the evidence against Mays was in any event strong. As such, the prosecutor's minimal misconduct, if any, was not flagrant.

Mays also contends the prosecutor engaged in misconduct when she told the jury she disagreed with the expert testimony that Mays suffered an intellectual disability. A prosecutor should not insert her "own personal belief" or make "comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Towe v. Commonwealth*, 617 S.W.3d 355, 363 (Ky. 2021) (quoting *Hall v. Commonwealth*, 551 S.W.3d 7, 18 (Ky. 2018)). Here, however,

16

the prosecutor's remarks were not framed in a manner to suggest special expertise or insight into intellectual disability, but rather appropriately limited to expression of a reasonable disagreement with the expert witness's conclusion. Indeed, the prosecutor stated she "just disagreed" and that she "fe[lt] differently." While the prosecutor perhaps could have more artfully framed her comments as an invitation for the jury to disagree with Dr. Turns, she ultimately suggested only a reasonable difference of opinion rather than special knowledge providing insight that the expert was wrong.

Moreover, the alleged misconduct, if any, could not be found flagrant as required to warrant reversal on grounds of this unpreserved error. Again, because the prosecutor framed her remarks as a reasonable disagreement rather than specialized knowledge, those remarks did not prejudice Mays. That framing likewise suggests no deliberate attempt to prejudice Mays, but rather an intentional effort to avoid a prejudicial suggestion of specialized knowledge or insight. Finally, the comment was also isolated, and again the evidence against Mays was strong. As such, we find no flagrant prosecutorial misconduct warranting reversal of Mays' conviction.

### III.    Mays Was Not Entitled To An EED Instruction.

Mays next argues reversal is required because the trial court refused his request for an EED instruction. Because Mays requested such an instruction at trial, the error is preserved. RCr 9.54(2). We therefore review for abuse of discretion. *Caudill*, 540 S.W.3d at 367. That is, we ask "whether the trial

17

judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Under Kentucky law,

> a person shall not be guilty [of intentional murder] if he acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be.

KRS 507.020(1)(a).[4] This Court has defined "extreme emotional disturbance" as "a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *Benjamin*, 266 S.W.3d at 782 (quoting *McClellan v. Commonwealth*, 715 S.W.2d 464, 468-69 (Ky. 1986)).

A necessary element of EED is the existence of "[a]dequate provocation, or a 'triggering event'" precipitating the extreme emotional disturbance. *Id.* This "triggering event" must be sudden and uninterrupted. *Id.* at 783. However, it need not be contemporaneous with the homicide, but rather may "'fester in the mind' before surfacing to exact its damage." *Id.* (quoting *Springer v. Commonwealth*, 998 S.W.2d 439, 452 (Ky. 1999)). As a corollary, EED is unavailable where "there intervened between the provocation and the homicide a cooling-off period sufficient enough to preclude a conclusion that the provocation was adequate." *Id.* A second necessary element of EED is that the

---

[4] An intentional homicide committed under the influence of extreme emotional disturbance constitutes the crime of first-degree manslaughter. KRS 507.030(1)(b).

18

there was a reasonable explanation or excuse for the extreme emotional disturbance, considered subjectively from the "viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." KRS 507.020(1)(a); *Benjamin*, 266 S.W.3d at 783.

A trial court must "instruct the jury on the 'whole law of the case, and this rule requires instructions applicable to every state of the case deducible or supported to any extent by the testimony.'" *Posey v. Commonwealth*, 595 S.W.3d 81, 86 (Ky. 2019) (quoting *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999)). Of course, the obligation to give an instruction is "dependent upon there being sufficient evidence to warrant" the instruction. *Id.* "The trial court has no duty to instruct on theories of the case that are unsupported by the evidence." *Id.* (quoting *Driver v. Commonwealth*, 361 S.W.3d 877, 888 (Ky. 2012)). An EED instruction "must be supported by definite, non-speculative evidence." *Id.*

Here, the proof Mays contends entitled him to an EED instruction does not satisfy this standard. First, an EED instruction is warranted only where the evidence is sufficient to support a finding that the defendant actually suffered from an extreme emotional disturbance. The only evidence Mays offers that he was in such a state at the time of the killing is that he left Hunt numerous and repetitive voicemails expressing escalating emotions, and that he was silent, pacing, and apparently upset immediately before leaving to commit the crime. Mays' characterization of the voicemails as showing escalating emotion is fanciful at best. A review of the voicemails shows they

19

are consistent, fairly calm messages from Mays alternating between conciliatory and questioning themes of love, being "done wrong", and seeking an explanation. More importantly, the voicemails in no way portray any lack of emotional control by Mays. This falls far short of definite, non-speculative evidence sufficient to support a finding Mays operated under a "a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes." *See Baze v. Commonwealth*, 965 S.W.2d 817, 823 (Ky. 1997) (noting that evidence the defendant was "upset" does not suffice to show extreme emotional disturbance).

It also bears noting that the evidence showed Mays absconded after the killing and was shortly thereafter found asleep in his home, further undercutting the possibility of any reasonable finding he was so enraged, inflamed, or disturbed as to overcome his judgment. Quite simply, an EED instruction was not warranted because the evidence could not support a reasonable finding Mays experienced an extreme emotional disturbance.

Second, an EED instruction is also warranted only if the evidence is sufficient to support a finding that there was a reasonable explanation or excuse for the extreme emotional disturbance, considered subjectively from the "viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be." KRS 507.020(1)(a). Here, the only provocation pointed to by Mays is the fact that Hunt ended their relationship

20

and cut off communication with him. Even considered subjectively from the perspective of a person in Mays' situation and under the circumstances he experienced, Hunt's ending of her relationship and communication with Mays cannot possibly be construed as adequate provocation or reasonable explanation or excuse for so extreme an emotional disturbance as to result in her death. Mays points to no evidence of some subjective aspect of his situation or beliefs that could possibly render the breakup a reasonable explanation or excuse for extreme emotional disturbance resulting in homicide. Indeed, we find it impossible to conceive of *any* subjective set of situations, beliefs, and circumstances that could warrant a finding that the mere ending of a relationship and cutting off of communication is a reasonable explanation or excuse for an extreme emotional disturbance. *See Meredith v. Commonwealth*, 677 S.W.3d 452, 464 (Ky. 2023) ("The event must be so dramatic as to render the mind temporarily uncontrollable and provoke 'an explosion of violence.'" (quoting *Luna v. Commonwealth*, 460 S.W.3d 851, 883 (Ky. 2015))). Thus, because there was no evidence to support a finding that Mays labored under an extreme emotional disturbance or that he experienced adequate provocation or had reasonable explanation or excuse for such a state, the trial court properly denied his request for an EED instruction.

IV. **Admission Of A Physician's Statement That Hunt Stated Mays Caused Her Injuries Was Harmless Error.**

Mays next argues reversible error occurred when the trial court allowed Dr. Paul Thomas, a doctor who treated Hunt for broken ribs, to testify that Hunt told him Mays had punched her in the eye with a closed fist and then

21

also kicked her in the ribs while wearing boots after she fell. Mays objected to admission of this evidence and his allegation of error is thus preserved. KRE[5] 103(a)(1).

We review a preserved allegation of nonconstitutional evidentiary error for abuse of discretion. *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018). Preserved evidentiary errors are also subject to harmless error review. *Carson v. Commonwealth*, 621 S.W.3d 443, 450 (Ky. 2021).

> "[A] nonconstitutional evidentiary error may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." "[T]he inquiry is not simply 'whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand."

*Mason*, 559 S.W.3d at 339-40 (quoting *Murray v. Commonwealth*, 399 S.W.3d 398, 404 (Ky. 2013)). Here, while we agree that Hunt's statements to Dr. Thomas that Mays inflicted her injuries was inadmissible hearsay, we find the error in the admission of that evidence at most harmless.

Hearsay, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is generally inadmissible. KRE 801(c); KRE 802. KRE 803(4) provides a hearsay exception allowing for admission of "[s]tatements made for purposes of medical treatment or diagnosis and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably

---

[5] Kentucky Rules of Evidence.

22

pertinent to treatment or diagnosis." Typically, however, the identity of a perpetrator "is not relevant to treatment or diagnosis." *Colvard v. Commonwealth*, 309 S.W.3d 239, 244 (Ky. 2010). Thus, we have held that as a general rule, KRE 803(4) does not authorize a medical provider to testify to a patient's hearsay statements regarding *who* inflicted her injuries.[6] *Id.* at 246-47. As such, Hunt's out-of-court statement to Dr. Thomas that Mays caused her injuries was not admissible under KRE 803(4).

However, the error in admitting that statement was at most harmless because it was cumulative of other evidence admitted at trial that Mays physically abused Hunt. Paige and Haley both testified to physical injuries suffered by Hunt during her relationship with Mays. Paige also testified to a violent incident she personally observed in which Mays threw Hunt against a wall. The jury also heard evidence regarding the IPOs entered against Mays, including that the IPOs included judicial findings domestic violence had occurred as well as a verbatim reading of the contents of Hunt's sworn affidavit stating Mays threatened her, physically harmed her, and put her in the hospital with broken ribs. As such, Dr. Thomas's testimony was purely cumulative and cannot be said to have substantially swayed the judgment in this case. The admission of that testimony was thus at most harmless error.

---

[6] This prohibition is not absolute. *See id.* at 247 (noting "[t]here may be circumstances in which [a patient's hearsay identification of a perpetrator] will be found to comport with the requirements of KRE 803(4) . . . ."). For example, where it is shown that the patient's identification of the perpetrator was reasonably pertinent to treatment or diagnosis and arose "from the patient's desire for effective medical treatment," the statement may fall within the scope of KRE 803(4). *See id.* at 246.

23

**V.    Trooper Forbus' Reference To Mays' Status As A Convicted Felon Was Not Palpable Error.**

Mays next argues reversal is required because Trooper Forbus, an officer who responded to Paige's 911 call on the day of the murder, testified the citation he wrote to Mays included a charge of being a convicted felon in possession of a firearm. Mays acknowledges the error is unpreserved, and we therefore review the issue for palpable error.

Mays' status as a convicted felon was irrelevant to the charges he faced at trial and thus the jury should not have been informed of that fact. However, Trooper Forbus' statement was fleeting and the Commonwealth did not elicit the testimony nor seek to emphasize it to the jury. When considering the fleeting brevity of the passing remark in comparison with the overall strength of the evidence of Mays' guilt, we find no possibility—much less a substantial possibility—that the trial would have resulted in a different outcome had the error not occurred. *See Davis*, 620 S.W.3d at 30 ("To determine if an error is palpable, 'an appellate court must consider whether on the whole case there is a substantial possibility that the result would have been any different.'" (quoting *Commonwealth v. McIntosh*, 646 S.W.2d 43, 45 (Ky. 1983))). As such, Trooper Forbus's comment was not palpable error and does not warrant reversal.

**VI.    There Was No Cumulative Error.**

Finally, Mays asserts reversal is warranted under the doctrine of cumulative error. Under this doctrine, "multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the

24

trial fundamentally unfair." *Leavell v. Commonwealth*, 671 S.W.3d 171, 184 (Ky. 2023) (quoting *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010)). The errors we have found here are the fleeting reference to Mays' felon status, Dr. Thomas's wholly cumulative statement that Hunt stated Mays caused her injuries, and prosecutorial comments that at most constitute minimal and non-flagrant misconduct. Significantly, none of these errors resulted in prejudice to Mays. As we have previously noted, "[w]here, as in this case, . . . none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice." *Id.* (quoting *Brown*, 313 S.W.3d at 631). We thus do not find that the doctrine of cumulative error warrants reversal here.

## CONCLUSION

For the foregoing reasons, we affirm the judgment and sentence of the Marion Circuit Court.

All sitting. VanMeter, C.J.; Bisig, Conley, Lambert, Nickell, and Thompson, JJ., concur. Keller, J., concurs in result only.

25

COUNSEL FOR APPELLANT:

Shannon Dupree
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General